## WILL OF BALL: BALL, Appellant, vs. BOSTON and others, Respondents.

*February 19—April 8, 1913.*

*Wills: Validity: Undue influence: Findings of trial court: Weight on appeal: Degree of proof: Burden of proof: Fraud.*

1. Every person of mature years and sound mind has an inherent right to make a will, which neither the court can abridge nor the legislature take away.
2. Regardless of the testamentary wish as to beneficiaries, if it be expressed lawfully, there is no right in law nor duty in equity other than to enforce it.
3. The testamentary, is as ample as the contracting, power, and courts should uphold exercise of the former as firmly as the latter, regardless of the wishes of disappointed relatives.
4. The charge that a will, good in form, and made by a person having testamentary capacity, is the will of another, produced by that other's undue influence, sounds in fraud.
5. In case of an inquiry as to whether a will, good in form, is void for undue influence, the rule applies that he who charges fraud, to prevail, must support his claim by clear and satisfactory evidence.
6. The rule that a trial judge's findings of fact are due to prevail unless contrary to the clear preponderance of the evidence, has weight according to circumstances. Its ordinary efficiency is lessened where findings rest on inferences from conceded or established facts, and reduced to a minimum or displaced where the conclusions are reached by mistaken ideas of law.
7. A finding of fact without due heed for the rule respecting its establishment, has little or no support in the presumption of correctness which requires a clear preponderance of evidence to displace it.
8. The distinction between clear and satisfactory evidence and mere preponderance of evidence, is substantial, and may properly be the turning force in balancing conflicting inferences.
9. In an inquiry as to whether a will is the product of undue influence, the same as others sounding in fraud, the *onus probandi*, from first to last, is on the one charging the wrong, requiring clear and satisfactory evidence to satisfy it.
10. The rule that,—in case of opportunity for the exercise of undue influence being clearly shown, a subject unquestionably susceptible thereto, and clear indications, by direct or circumstan-

tial evidence, of exercise thereof, the person to be benefited by the wrong is called upon to rebut the presumption against him by showing good faith,—does not involve any shifting of the burden of proof.

11. In case of its appearing, *prima facie*, that preference by will was secured by undue influence, and defendant so weakens such showing that the essential evidentiary circumstances no longer rest on clear and satisfactory evidence, such showing will not warrant a recovery.

12. A testamentary preference secured by undue influence contemplates existence of a wrongdoer and perpetration by him of a fraud upon an unwilling or unsuspecting victim; rendered substantially powerless by "insidious approaches, seductive artifices, or other species of circumvention," disabling such other from acting of his own volition.

13. Undue influence is the antithesis of right influence. One may, in some circumstances, rightfully influence and persuade another to provide by will in his or her favor, especially in case of a wife or near relative, so long as the testator, in the end, acts upon his own judgment.

14. Opportunity to exert undue influence spoken of among essentials of a *prima facie* circumstantial showing of the procurement of a will by undue influence, is not satisfied by the ordinary and natural seclusion and association in the domestic relations of husband and wife.

15. Neither the natural attentions of a wife to her invalid husband, nor her helpful efforts in caring for his business and property, nor efforts, at his request, to aid him in efficiently expressing his dying wishes as regards his property, are badges of fraud.

16. The natural characteristics of secrecy in making a will, either as to the fact of making or the contents of the paper, do not answer to that secrecy sometimes legitimately referred to as circumstantially bearing on the question of undue influence.

17. The *onus probandi* being on the person charging procurement of a will by undue influence, incidents in the lives of an alleged victim and wrongdoer being shown to circumstantially establish the charge, which might be regarded condemnatory or innocent according to circumstances, the latter should be taken as the true aspect in the absence of satisfactory indication to the contrary.

18. Setting aside that which purports to be a man's final testamentary wishes, is of such serious nature that, in case of an alleged wrongdoer being so near to the testator as that of a wife, especial care should be exercised to avoid possibility of defeating the dying hope to have provided for his surviving

spouse.   No mere suspicious circumstances should have weight nor inference of wrong be raised from the natural incidents of the relations of husband and wife.

[Syllabus by MARSHALL, J.]

WINSLOW, C. J., and BARNES, J., dissent.

APPEAL from a judgment of the circuit court for Oneida county: A. H. REID, Circuit Judge.   *Reversed.*

Action involving the validity of a will.

In due proceeding in the county court of Oneida county for the establishment of an instrument proposed as the last will and testament of William Francis Ball to be such will in fact, the petition therefor was denied.   An appeal from such decision was taken to the circuit court for such county, resulting in an affirmance thereof, based on findings to this effect:

1. September 24, 1911, Mr. Ball died, aged seventy years and past.

2. His wife survived, also a daughter, *Ida Boston,* and two sons, *Roy* and *Charles,* all being adults.

3. August 28, 1911, in his last sickness Mr. Ball made a will, good in form, giving all his property to his wife.

4. He had a livery business which he had conducted for some twenty years, was worth about $6,500, and owed about $2,000, secured on his real estate.

5. He first married Sarah Brown, who became the mother of the three children, the contestants herein, lived happily with his family until she died in 1905, and during that time, accumulated substantially all his property.

6. He was uniformly kind to his children until he remarried; received from *Roy,* some nine years theretofore, $600 in notes, and from *Charles* $400 in money, with the understanding that he should have an interest in the business; allowed the claims in favor of his sons to outlaw but employed *Roy* in his later years to help run the business and left him in charge when he last visited the stable.

7. Soon after Sarah died, he employed *Delia Orinda Mc-*

*Kelvery* as housekeeper and kept her some two years, when he sold his home and broke up housekeeping. She had been twice married, was of strong mind, about fifty years of age, and acquired a strong influence over him while she was his housekeeper, he coming to rely and feel dependent upon her and resort to her house to be nursed in his sickness.

8. Mr. Ball was afflicted for twenty years with a progressive habit of indulging in intoxicants; resulting in his health being impaired and cirrhosis of the liver developing, which, complicated with stomach trouble and an open fistula, ended his life.

9. June 6, 1910, Mr. Ball married his previous housekeeper, went to live at her house some distance in the city away from his children and old friends, grew more and more estranged from the former, accepted active interest and advice of his wife in his business, ceased to consult with the children, and tried to change a policy of life insurance which ran to his first wife and her heirs so as to run to his second wife. She purposely promoted his unnatural treatment of his sons by putting a two-year-old laundry bill she had against one of them, without first demanding pay, in the hands of a lawyer with instructions to sue, causing *Roy* to be arrested and jailed on the charge of disorderly conduct, and taking control of the business from him and putting another person in his place.

10. In general, after the second marriage, Mr. Ball was in such poor health as to weaken his mental faculties and render him more and more dependent upon his wife with whom he lived alone, seldom communicating with his children.

11. Two days before making the will, he took to his bed in his last sickness and, thereupon, his wife increased her activity in looking after his business, secured her attorney, who was unknown to him, to draw his will and chose a friend of hers to witness it, kept the making thereof a secret, refused to allow his sons to see him alone until after the will was

drawn, and had full opportunity to prejudice him against his children.

12. *Mrs. Ball* had opportunity, ability, and disposition to unduly control the will of her husband in her own favor,— resulting in his making his will under her suggestion and expressing her desire rather than his voluntary purpose.

Upon such findings the conclusion was reached that the decision appealed from was right. Judgment was therefore ordered and rendered affirming the same with an allowance of $25 attorney's fees to the successful party, but without costs for or against the proponent.

For the appellant there was a brief by *Chas. F. Smith, Jr.,* and *John Van Hecke,* and oral argument by *Mr. Van Hecke.*

For the respondents the cause was submitted on the brief of *Miller & Reevs.*

MARSHALL, J. As often, and not too often, said, the testamentary right is one of the most important of the inherent incidents of human existence. It has been so regarded since the dawn of civilization. As an eminent text-writer put the matter, "It has been held sacred by all nations and under all conditions;" and, we may add, it has in no time or place or condition been more significantly upheld than during the period of development in the countries blessed with, and characterized by civic growth, promoted by, principles of the common law. It is not a mere privilege which legislatures can directly or unreasonably regulate to destroy. It is not an incident of the possession of property which courts can deal with in any spirit of mere discretion. It is a right, absolute, which every person of mature mind and disposing memory may exercise, subject to some regulations to prevent abuse of it and to safeguard it, as he sees fit. Filial expectancy of profiting by inheritance, is proper. Reasonable indulgence in it is natural and judicial conservation of the free exercise of volition to satisfy it, is demanded; but, in a very high de-

gree, the testamentary right, as compared with that of the mere subjects of testamentary charity or bounty, is the superior. As said for the court in *Vance v. Davis*, 118 Wis. 548, 95 N. W. 939, "The highest equity which courts can consider is the right of an individual to dispose of his property as he chooses. The hope of inheritance, which any child may indulge in during a parent's life, bears no comparison in the eyes of the law to the right of disposal by the parent." If one testamentarily gives his property in a particular lawful way, "there is no duty of equity or conscience to thwart that will."

The foregoing observations are deemed proper as pointing, in general, the attitude with which trial courts, and all courts, should consider a question presented as to whether a will, made with all the formalities prescribed by law to safeguard and evidence the free exercise of the testamentary right, especially where testamentary capacity is either not disputed or not successfully impeached, shall be judicially enforced as the real wish of the testator or suppressed as a fraudulent production; a creation of the volition of another, wrongly imposed upon the testator so as to give it the cast of the latter's considerate effort. It is not infrequent that there is evidence in a trial record that the particular situation dealt with was measured with rather an exaggerated idea of the rights of disappointed relatives, partially or wholly eclipsing the real right to be protected above all. *Vance v. Davis, supra; Will of Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W. 778; *Loennecker's Will,* 112 Wis. 461, 88 N. W. 215; *In re Butler's Will,* 110 Wis. 70, 85 N. W. 678; *Will of Dardis,* 135 Wis. 457, 115 N. W. 332.

The sole question in a will contest is, Does the purported will legally express the testator's dying wish? His right, not that of any survivor, is the dominant thing. The will may be very unlike what it would seem, from a moral standpoint, it ought to be, yet if it lawfully expresses the testator's dying

wish, that ends the subject,—there is no power in equity to change it or set it aside,—the judicial power exists only to execute it. *Vance v. Davis, supra; Will of Rice, supra.* As remarked by RYAN, C. J., in *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103:

"Breaking a will is very much like making one," imposing on the testator a rule for the distribution of his estate "against his solemn wish in dying." "Every one should have power to dispose by will, after his death, in accordance with his own wishes, of whatever he may leave behind him in his own sole right, as he had in life to dispose of it by contract or gift. And it is as much the duty of courts to uphold his will after death, as to uphold and enforce his contracts made during life."

It is not intended by the foregoing observations to suggest that there was any want of familiarity by the learned trial court in disposing of this case with the salutary principle expressed and so often illustrated in the opinions of this and other courts; or that there was any purpose to unmake the will of Mr. Ball and remake it along the lines of a statutory distribution,—thought to be more considerate, under the circumstances, of the moral claims of his children. The effect of the logic which led to the result complained of is the paramount question.

There are many evidentiary conclusions leading to the vital matter of fact in issue. It is contended by appellant that such evidentiary circumstances are, in some cases, without any evidence to support them, in others, contrary to the clear preponderance of the evidence, and, in others, in conflict with direct and circumstantial proof showing the contrary, and, that, in any event, the final inference of fact is wholly unwarranted. That is a severe arraignment of the findings and calls for pretty close examination of the record.

Before taking up, in detail, the numerous complaints as to the findings, it seems best to advert to some well settled principles of law applicable thereto.

In general, findings of fact made by a trial court are disturbable with much difficulty, for reasons often stated. Those reasons have less and less force till they cease to apply at all, according to circumstances. They have no force at all in case of the result having been reached by misconception of the law. *Maldaner v. Smith,* 102 Wis. 30, 78 N. W. 140; *Kelley v. Crawford,* 112 Wis. 368, 88 N. W. 296; *Harrigan v. Gilchrist,* 121 Wis. 127, 312, 99 N. W. 909.

It must be appreciated that the alleged wrong sounds in fraud. *Small v. Champeny,* 102 Wis. 61, 68, 78 N. W. 407; *Vance v. Davis,* 118 Wis. 548, 95 N. W. 939; *Loennecker's Will,* 112 Wis. 461, 88 N. W. 215; *Winn v. Itzel,* 125 Wis. 19, 103 N. W. 220; *Gordon v. Burris,* 153 Mo. 223, 54 S. W. 546; *Grove v. Spiker,* 72 Md. 300, 20 Atl. 144; *Mackall v. Mackall,* 135 U. S. 167, 10 Sup. Ct. 705. Terms of apparently double meaning will be found used in respect to the subject, such as "fraud and undue influence;" "fraud or undue influence," in connection with suggestions that the terms "fraud" and "undue influence" are not technically synonymous, though if there be any difference it is, probably, that between actual and constructive fraud.

In *Will of Slinger,* 72 Wis. 22, 37 N. W. 236, the late chief justice, speaking for the court, said: "Manifestly, it is a subtle species of fraud, whereby mastery is obtained over the mind of the victim by insidious approaches, seductive artifices, or other species of circumvention." Note the judicial conception of the essentials of the wrong found in this case, "insidious approaches, seductive artifices, or other species of circumvention." We could not put too much emphasis thereon to contrast therewith those perfectly legitimate influences between husband and wife, which will be later referred to and, in the light of which, the real facts of this case must be viewed.

In *Gordon v. Burris, supra,* the court remarked, without qualification, that undue influence is a fraud, and in *Grove v.*

*Spiker, supra,* that it is closely allied to actual fraud. It is, really, one of the most reprehensible of deceits because of the cunning, insidiousness, and artifices of seduction, which, in general, characterize it and by means of which the unsuspecting victim is rendered powerless to carry out his own wishes or resist those of the wrongdoer.

Thus it will be seen that, in a case of this sort, if there is failure to appreciate that the gist of the attack upon the will is fraud, and the rule applies that, he who alleges fraud must establish it,—not by a mere preponderance of, but by clear and satisfactory, evidence,—the finding as to the vital fact is liable to fall within the rule before stated as to want of dignity because of having been reached without proper legal guidance.

The rule of clear and satisfactory evidence in fraud cases, as distinguished from mere preponderance of the evidence, is substantial and may, very properly, be the turning point, especially, when the matter rests in mere inference. As has been frequently said, while in ordinary civil matters the person on whom the burden of proof rests may rely upon evidence establishing the facts to a reasonable certainty, though the evidence be not, in all respects, clear and satisfactory, not so where fraud is the gist of the matter, then he must go further,—not to the extent of establishing the charge with the highest degree of certainty, but to that one which rests, not only in reasonable certainty, but on evidence which is clear and satisfactory. Though the difference may appear somewhat shadowy it exists and forms a substantial basis for a rule firmly intrenched in our jurisprudence. *Lepley v. Andersen,* 142 Wis. 668, 671, 125 N. W. 443; *Harrigan v. Gilchrist,* 121 Wis. 127, 313, 99 N. W. 909. Its logic rests in a presumption against wrong akin to that of innocence in a criminal case. Whether the salutary rule was not lost sight of in this case, challenges attention for reasons which will appear as we proceed.

We note the statement in the learned circuit judge's opin-
ion that, the contestants having established a *prima facie*
case of undue influence, the burden was upon the proponent
to show that the will was the testator's own voluntary act.
That is somewhat ambiguous, in view of the expressions found
in *Davis v. Dean,* 66 Wis. 100, 26 N. W. 737; *Disch v. Timm,*
101 Wis. 179, 77 N. W. 196, and some other cases, from
which it might be inferred, perhaps not without warrant, that
in this class of cases, the burden of proof is on the person
charged with fraud to prove affirmatively that there was no
such wrong upon a *prima facie* case being circumstantially
made against him; that then the burden of proof shifts and
remains with the defendant.    Those expressions were some-
what emphasized by the statement in *Vance v. Davis,* 118
Wis. 548, 95 N. W. 939, that, "in apparent contradiction of
the ordinary rule requiring clear and direct proof of fraud,
this and other courts have recognized the necessity of casting
the burden of negative proof upon one who profits from a po-
sition of confidence and control by a conveyance of such char-
acter and made under such circumstances as to suggest im-
probability that it is the free act of the grantor, and probability
that it is due to influence of the beneficiary."    All such ex-
pressions, understood with reference to the premises upon
which they are based, and the particular facts dealt with, are
free from serious, if not from any, infirmity, yet they have
misled, sometimes, as the records here bear evidence.

Whatever of misleading character there is in the expres-
sions referred to, was intended to be eliminated from our
jurisprudence in the treatment of the subject by the present
chief justice, speaking for the court, in *Winn v. Itzel,* 125
Wis. 19, 32, 103 N. W. 220, thiswise:

"We do not understand that the principle there approved
changed the practice in fraud cases, or affected the order of
the trial of such cases.    Parties who charge fraud must prove
fraud after as well as before that decision,"—referring par-

ticularly to *Vance v. Davis*. "They still have the burden of proof. It was simply held in that line of cases that when a plaintiff, charging fraud, had proven certain facts, he had made a *prima facie* case, though he might not have produced any direct evidence of fraudulent acts or words. . . . When the plaintiff makes a *prima facie* case, entitling him to relief if the proof stops there, the defendant must take up the burden and meet the case so made by other evidence. This is the case in all contests of fact. It is not peculiar to fraud cases. The rule of *Davis v. Dean* did not deny the long established rule nor did it tend to do so. It simply announced what facts would be considered as *prima facie* proof of fraud, requiring explanation by the defendant."

Thus it will be seen, in a case of this sort, upon a *prima facie* case being circumstantially made calling upon the person charged with fraud to explain his conduct, there still stands the presumption against wrong doing, eclipsed for the time being by the adversary presumption, but, subject to be efficiently aroused by affirmative evidence, direct or circumstantial, so satisfactorily explaining the adversary circumstances that they no longer seem to exist by clear and satisfactory evidence. In the end, upon the whole case, the circumstances from which the alleged undue influence is inferable as matter of law must stand upon such evidence. That is, the burden being upon the one charging undue influence, from first to last, to establish it by clear and satisfactory evidence, the rule goes to the existence of the circumstances; the effect of the circumstances is matter of law. Weaken the case as to any one of the vital major incidents so that it can no longer be said to exist by clear and satisfactory evidence; then the *prima facie* case once created is so far rebutted that the plaintiff cannot successfully stand thereon, but must go further.

A brief treatment of what constitutes undue influence and what circumstances are essential, where such evidence, alone, is relied upon by the person charging fraud, will aid in test-

ing the question of whether the findings here, as to mere evidentiary incidents, has a sound basis in the evidence, as well as whether they establish, with the requisite degree of certainty, even *prima facie,* the major circumstance, essential to support the legal presumption of wrong doing. .

The general characteristics of undue influence are strikingly presented in *Will of Slinger,* before adverted to. The actor is treated as a wrongdoer,—one bent upon a reprehensible purpose; the other as his unwilling or unsuspecting, in any event under the circumstances, powerless victim of the purpose effected by "that subtle species of fraud,"—where such helplessness to resist direct or indirect suggestion is produced by "insidious approaches, seductive artifices, or other species of circumvention." Undue influence is the very antithesis of right influence. It exists only where there is practical destruction of voluntary volition,—at least, is moral coercion for an ulterior purpose. *Anderson v. Laugen,* 122 Wis. 57, 99 N. W. 437. This species of wrongful influence should never be confused with influence through affection or disposition to favor a member of one's family produced by legitimate feelings of esteem or gratitude.

One may be very strongly influenced by a wife, or other person standing in close relation to him, to prefer such person in the final disposition of his property. He may even be strongly importuned, his judgment appealed to and reason convinced by argument to a desired end, if there is no wrong influence, so long as he finally, by his own volition, carries his purpose thus arrived at into effect. *In re Will of Jackman,* 26 Wis. 104; *Deck v. Deck,* 106 Wis. 470, 82 N. W. 293; *Mueller v. Pew,* 127 Wis. 288, 106 N. W. 840; *Appeal of Turner,* 72 Conn. 305, 44 Atl. 310.

The language of this court in the *Jackman Will Case* has been, in terms, or effect, reiterated here in numerous decisions and cited, time and time again, with approval elsewhere. The

influence of a wife or child, if exerted in a fair and reasonable manner, is not unlawful, and in order to be undue "it must be exerted *mala fide,* to produce a result which the party, as a reasonable person, was bound to know was unreasonable and unjust." "As neither courts nor parties can make wills for men they ought to be careful in unmaking them." The influence denounced by the law must be something more than "the influence of affection or attachment" or design of gratifying the wishes of one beloved, respected, and trusted by the testator." *Jackson v. Hardin,* 83 Mo. 175, 185. "Mere solicitation will not be sufficient to vitiate a will made by a person having a knowledge of what he is doing, and intending to do it, though his act may be brought about by solicitation, or that kind of influence which a disposition to gratify another may produce." *Sutton v. Sutton,* 5 Harr. (Del.) 459, 461. Mere kindness of treatment and proper attention which stimulates the desire to reward from an intelligent sense of duty are legitimate. *Appeal of Turner,* 72 Conn. 305, 44 Atl. 310; *Barlow v. Waters* (Ky.) 28 S. W. 785, 786; *Nelson's Will,* 39 Minn. 204, 39 N. W. 143.

Thus this court, and most courts, have spoken, to guard against wishes of disappointed relatives improperly disturbing the testamentary right, either because of a judicial failure to differentiate between undue influence and due influence, or to appreciate that the instrumentality for avoiding wills upon the ground of undue influence is, primarily, to conserve the rights of the testator, not those who would profit from his estate by displacing his will. The danger of so far dignifying the incidental as to endanger the primary right, magnify suspicion into proof, and impair the capacity of a person to reward a wife or other relative for that care in the helplessness of old age, sometimes accompanied with such infirmities as to require attention beyond the power of mere money to obtain, was adverted to in *Vance v. Davis,* 118 Wis.

548, 95 N. W. 939, and particularly in *Mackall v. Mackall,* 135 U. S. 167, 172, 10 Sup. Ct. 705, the court speaking thus:

"Influence gained by kindness and affection will not be regarded as undue if no imposition or fraud be practiced, even though it induced the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and administered to his wants, if such disposition is voluntarily made."

"It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it would deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them."

The foregoing, as to the nature of undue influence, raises the question, logically, as to the essential circumstances for its establishment, where there is no direct evidence. That has been frequently, in terms or effect, answered. There must be a subject "unquestionably susceptible to undue influence," a disposition to undue influence for the purpose of procuring the improper favor, opportunity to exert that influence and effect the wrongful purpose, and it must be exerted so as to deprive the victim of free agency "and constrain him to do not only what is against his will, but what he is unable to refuse or too weak to resist." That, in the *Jackman Will Case* (26 Wis. 104), has been, in effect, repeated many times. The law does not lay hold of and render the first three elements, *prima facie,* clear and satisfactory evidence of the accomplishment in advance of their being established with that degree of certainty. They cannot rest upon mere preponderance of the evidence or suspicion. This feature is important in anything like a close case. The trial judge here reached the conclusion that such three elements existed. In that he proceeded by logical steps to the ultimate fact. Whether he appreciated the essential of certainty referred to does not appear from anything said in the opinion, and if we should conclude he did not from the findings themselves, as before indicated, they should be shorn of the pre-

sumption in their favor.    That the stated degree of certainty
is necessary, follows from the very nature of the case and
has been expressly recognized in the authorities before cited,
and significantly in *Fox v. Martin,* 104 Wis. 581, 80 N. W.
921; *Loennecker's Will,* 112 Wis. 461, 88 N. W. 215.    The
rule is stated in the latter case as practically the logic of the
former, that there must be shown a subject "unquestionably
susceptible to undue influence . . . also some clear evidence
of opportunity and a disposition on the part of the beneficiary
to exercise such influence."    That is repeated in *Vance v.
Davis,* 118 Wis. 548, 95 N. W. 939; *Winn v. Itzel,* 125 Wis.
19, 103 N. W. 220, and other cases, all to the general effect
that the presumption against wrong is too probative to be over-
come by anything short of clearly established circumstances
clearly inconsistent therewith.

In the foregoing legal environment of this case we will pro-
ceed to examine the numerous complaints of the findings of
fact.

The general effect of the exceptions is that the trial court
viewed the case with suspicion from the mere fact that
Mr. Ball, an old infirm man with three adult children, which
he had ordinary regard for, took a second wife, lived with
her a little more than a year in practical seclusion from his
children, then deceased; having in his last sickness and about
a month before the end left her by will all his property.    The
idea is that proponent's case having been thus wrongfully re-
garded, many little actual or supposed incidents were woven
together to confirm such suspicion, some of such incidents hav-
ing no support in the evidence and some found from the most
unfavorable inferences the evidence would reasonably bear, re-
sulting in many ordinary occurrences being given the cast of
"insidious approaches, seductive artifices, or other species of
circumvention," and proponent being convicted of having
subverted Mr. Ball's mind and destroyed his capacity to exer-
cise his own volition in disposing of his estate,—contrary to
direct evidence that he made his will while in full possession

of his faculties; that proponent neither gave direction nor made a suggestion in respect to it, and that he acted in her absence from his presence and without her knowledge respecting what was embodied in the testament. If this broad general claim is borne out by the record, obviously, the legal principles to which we have adverted were not given their appropriate force.

In view of the general scope of the complaints made by counsel for appellant, it seems best to state here the general character of Mr. Ball's life and his surroundings at the time of making the will, particularly the size of his estate and the legal and moral claims which, in the natural course of things, one circumstanced as he was would be likely to recognize.

Mr. Ball lived with his first wife happily, it would seem, from the time he was a young man until he was about sixty-five years of age. She bore him three children, two boys and one girl, and all lived at home until of age and two had secured homes for themselves. The daughter married before her mother died and became well located with a prosperous business man as her husband in a city some distance from her father's home. The oldest son was some thirty-eight years of age when the will was made. He was without family and had lived apart from his father for some years though assisting him, for pay, in running the stable. He was accustomed to using intoxicants, but was in good health and abundantly able to take care of himself. The youngest son, at the end, was about twenty-seven years old. He lived with his father some three years after the mother died, then married and established a home of his own, in which he resided with his wife and child. He was possessed of an income of $1,800 per year. All were independent of the father. No one of them was so situated as to be able, conveniently, to make a home for him in his old age. He had no reasonable expectation of that care from his children which he required on account of his age and infirmities. He had always been domestic in habits

and kindly disposed towards his family, especially his wife. He was that solicitous for the first one, with whom he lived thirty-five years more or less, that he early took out and kept up a policy of life insurance of $1,000 for her sole benefit, as he evidently supposed.   About a year after her death he employed *Mrs. McKelvery,* a woman about fifty years of age, an industrious rather strong character, as housekeeper, so as to preserve his home life.   After his youngest son made a home for himself, Mr. Ball sold his place and boarded and roomed alone.   About a year thereafter he married *Mrs. McKelvery.*   Such mutual regard existed between them and had been fostered by her serving him faithfully for some two years as housekeeper and later nursing him in sickness, as might reasonably be expected in case of a man of his years, kindly disposed and of domestic habits, and a woman of her years and station, associating together as they had much of the time, the old gentleman needing the assistance in his business and the care which the strong woman was able to render, and she being willing to afford such assistance and care in consideration of companionship and such reasonable expectation of being provided for in the final disposition of his property as a man of his disposition would be likely to gratify. She made a home for him and served him faithfully as a wife to the day of his death, bestowing upon him, to the limit of her ability, all the care which she was capable of, and making his life as comfortable as she could.   He endeavored to transfer to her his life insurance policy, but was unable to do so. At the last, he saw no way of providing for her except by will. No one of his children stood in need of his assistance.   The thousand dollar insurance policy, which he regarded as his property, he found to be legally that of his children.   He had, as he thought, when reduced to money and all claims and expenses paid, very little.   There was real estate and personal property, estimated to be worth about $6,500, but his indebtedness was so large—being some $3,500—as to render neces-

sary conversion of his estate into money in settling the same. The outlook was such that, after paying the indebtedness, expenses of administration and, in case of intestacy, providing for the statutory allowances to his wife, there would not be much to divide,—no more than enough to afford each of the children a few hundred dollars. Under those circumstances, with full testamentary capacity, separate and apart from his wife, he made the will which he may well have thought would not yield her for support, facing an expectancy of life of some eighteen years, and for past and future care of him, more than $1,500 or so in ready-money value.

True, the findings are to the effect that the net estate was of the value of $4,500, but that seems clearly contrary to the evidence to the extent of more than $1,500, as we shall see, even if the estate were of the ready-money value of the full inventory—which is not very likely,—leaving out of view expenses of administration and statutory allowances to the widow. Counting those matters, the probable result of intestacy and the probable result of attempting to turn such property as Mr. Ball had into money, as he must have viewed the matter when he made the will, the court placed the net estate rather more than twice the real value.

At this point a serious infirmity appears in the trial disposition of the case in the judge's opinion,—much more so in the findings. It is significant that the expenses of administration and the rights of the wife as to statutory allowances and the unsecured debts were wholly overlooked, especially in the findings. That might have had a very material bearing on the final result. In the opinion the net estate was placed at $3,500, while, as before indicated, the figures were raised to $4,500 in the findings, wholly overlooking the unsecured debts and other matters which would necessarily require the equity in the real estate to be sold in order to obtain money for their discharge. To say that Mr. Ball could have thought the effect of his will would be to net his wife $4,500, or half that sum or

much more than $1,000 in excess of what she would be entitled to in a statutory distribution and settlement, does not seem to be borne out by a fair appreciation of the situation disclosed by the evidence.

In view of the general situation as above pictured, the theory of the decision that Mr. Ball made an unnatural disposition of his property must be unsound, unless there be sufficient in the detail circumstances of *Mrs. Ball's* conduct towards her husband and his conduct under her influence, to radically change the aspect of things. Without such efficient details, it looks as if he did about what a man seventy years of age,—of domestic habits, who had enjoyed a good home for about thirty-five years or so and been bereft of such for several years and, having a few more years in expectancy during which he would stand in great need of wifely care, and a small amount of property and taken for a companion a woman in honorable widowhood, strong in body and mind, of suitable age for the wifely duties he needed,—might be expected to do, if such, knowing his habits, his infirmities, and his fortune, would be willing to enter into such a marriage contract. It is perfectly natural and by no means improper that such a union should take place, promoted only by mutual regard and expectation of the stronger party being remembered, pecuniarily, in the end, and without any element of that personal nature characteristic of the flower of life. If Mr. Ball thought to reward his wife as well as he reasonably could for her services to him, and she thought to acquire and earn such pecuniary reward as her husband, under the circumstances, might be willing to bestow upon her when near the end and able to fairly measure the value of the consideration rendered by her, all was natural and proper. It would be a most lamentable state of things if, in responding to an appeal, in form, for protection of the testamentary right, the disappointed hopes of relatives, under such circumstances as we have here, should have such weight as to defeat the plan of an

old man, situated as Mr. Ball was, of providing for the care needed in the last years of his life.

So the feature of the decision, which evidently had great weight with the trial judge, found in this language:

"Her marriage to the deceased when he was nearly seventy years old, broken in health and burdened by age and his bad habit of alcoholism, was either very self-sacrificing on her part or the result of a design to financially profit by the marriage,"

was not entitled to such regard. The idea seems to be that, for a woman circumstanced as the one in question was to marry a man circumstanced like Mr. Ball, unless it were a case of self-sacrifice on the part of the former instead of anticipated pecuniary remuneration for physically caring for the latter, would be evidence of a design to exercise undue influence and so obtain the pecuniary element by fraud. That is unsound. There is nothing improper about such a marriage, intelligently entered into and characterized by mutual respect, enabling the parties to live peacefully and sympathetically together. There could not be mutuality of efficient adequate consideration in such a case, without the element which seems to have been supposed to be unworthy. There is nothing about such an element, by itself, to arouse even a suspicion of fraudulent intent. Therefore it was error to take such circumstance as a foundation badge of fraud and look thence for evidentiary details of a confirmatory nature.

On the point of whether the final disposition by Mr. Ball was unnatural we do not overlook the two incidents mentioned, that Mr. Ball did not recognize the moral obligation to reimburse his son *Roy* on account of the latter's $600 in notes used by the former so many years before his death that the legal right to be paid therefor had been extinguished by the statutes of limitations, and the like moral obligation to his son *Charles* for $400 of borrowed money. Assuming absence of a clear preponderance of evidence against there being

such claims (and we will say in passing the evidence is not very satisfactory in favor thereof), Mr. Ball may well have thought the part reaching the sons of the thousand dollars of insurance money, under all the circumstances, pretty well evened up the account from a moral standpoint.

We will turn from the general features of the case to the first of the three primary essentials of undue influence, viz.: opportunity to commit the fraud. The trial court found that, easily, from the circumstance that Mr. and *Mrs. Ball* lived, mostly, by themselves from the time of the marriage till the end. He was customarily, until near the last, during business hours, like any business man, away from his home. There was no unnatural exclusiveness in the home life, so far as we can see. Except for an incident of *Roy's* wanting to speak with his father about business matters between them, and *Charles* calling once or twice when *Mrs. Ball* thought the father was resting and did not wish, or ought not, to be disturbed, there is nothing to show that they, or any one else, was not free to see and talk with the sick man upon any proper occasion. He associated with *Roy* every day before the last sickness, saw him once afterwards, and he was free, so far as appears, except for his own fault, to help take care of his father at any time. The reason why he did not offer to do so will appear later. That Mr. Ball was protected from disturbance, under the circumstances, and *Mrs. Ball* endeavored to have only such persons with him as were needed for his proper care, is the usual thing and may well have been advised by the physician. So, while there was opportunity for undue influence to the extent, merely, that Mr. and *Mrs. Ball* lived in the seclusion and exclusion of married life, such is not the kind of opportunity, in general, referred to in such cases as this. The ordinary privacy of married life is not to be looked upon as opportunity for one of the pair to commit a fraud upon the other. There must be pretty conclusive proof of active efficient efforts to improperly seclude the person,

said to have been defrauded by another, where the alleged wrongdoer and the alleged victim are husband and wife, to give the mere period and zone of isolation, even an atmosphere of suspicion.

On the next primary element in a case of this sort,—"a subject unquestionably susceptible to undue influence,"—we are at a loss to discover any satisfactory evidence. Mr. Ball, by the uncontroverted evidence, even up to and for some time after the day when he made his testament, was a strong-minded, self-willed man. He gave very decided orders with reference to his business affairs, and firmly insisted upon their being carried out. There is no medical testimony, sufficient to carry any substantial weight, that up to the time the will was made his infirmities had seriously weakened his mind. There is no evidence that he was solicited to make the will or with reference to anything in it. The idea of making the will and the ideas which were embodied in it, appear, by all the direct evidence, to have been his own. He sent for the lawyer to draft the paper. True, he made his wife his messenger, but why not? There is not even a ground for suspicion in that. He knew, with much definiteness, what he had to dispose of by will, rightly thought it was but little, that he was under great obligations to his wife and was likely to be under still greater, before he died. He dictated what should go into the will, entirely separate and apart from her and with very full appreciation of what he had, what it was worth, and who were his heirs at law. All such matters were spoken of. Later the draft supposed to respond to his wishes was read to, examined by, and decidedly approved by him. It was then executed without *Mrs. Ball* having any knowledge of what was in it or having anything to do with it, according to much and all the direct evidence, except that at the request of Mr. Ball she was the messenger sent to obtain presence of a person, suggested by him, for one of the witnesses. He was strong enough to arise from and sit on the edge of his bed

while signing the paper and repulsed the suggestion of help-
ing him.   He showed then and for several days thereafter
the self-will which had always been characteristic of his life.
The paper was left in his possession at his request.   All there
was of a secretive character about keeping it from the pub-
lic, was according to the natural order of things and at his
request.   He lived for about a month after the will was made,
and, except the last few days at least of his life, was sound
mentally.   The direct evidence is full in respect to all these
matters and so persuasive that we cannot well escape the con-
clusion that there is no legitimate basis in the record for
holding Mr. Ball, at the date of his will, to have been, un-
questionably, subject to undue influence.

We might stop at this point, but it will emphasize the re-
sult which must be reached by referring to a few of the in-
firmities, in detail circumstances, which evidently had much
to do with the decision below.   It is said, *Mrs. Ball* took
Mr. Ball to her home to live when they intermarried and that
it was some distance from where he formerly resided.   What
wrong was there in that, or suggestion of improper design
under the circumstances?   She had a home and Mr. Ball did
not.   True, it was a few blocks from where he formerly lived,
but was easily reached in a few moments' walk.   The cir-
cumstance, though given much significance in the decision,
really seems too unimportant to cut any figure in the case.

Mr. Ball, it is said, endeavored to have his wife named as
beneficiary in the policy of insurance.   No such subject is
mentioned in the opinion, but it is given significance in the
findings as if it required explanation by *Mrs. Ball* in addition
to her positive direct testimony that she had nothing to do
with it.   Why such matter required explanation, is not per-
ceived.   Mr. Ball, as before indicated, took out the policy in
favor of his first wife in the usual way.   After she died, re-
gardless of the real status, that he thought the policy belonged
to him, and supposed that he had a right to carry out his pri-

mary idea of his surviving wife being the beneficiary, is most natural.   Most men, circumstanced as he was, especially at the time when he did what the trial court thought suspicious, would have regarded such an insurance policy subject to their disposition.   It was a thing which he bought and paid for as much as anything else he possessed.   It is not likely he appreciated that, in case of his first wife predeceasing him, the policy would belong to his children.   He may well have had in mind, when he married *Mrs. McKelvery,* remembering her for giving him a home and nursing him in his last days, conferring upon her the benefit of the life insurance in addition to her statutory allowances, and that when he was unable to do so, concluded to provide for her as he did.

It is found that *Mrs. Ball* took much interest in her husband's business and, did so increasingly, as his infirmities progressed.   Why should not a wife take an interest in her husband's business affairs, more or less, according to his ability to attend thereto without her aid?   Would a capable wife omit to do so under such circumstances as Mr. Ball was in?   Instead of such an incident as the court referred to being regarded as indicative of a fraudulent design, should it not be looked upon as the very thing to have been expected under the circumstances,—the thing which both parties probably had in contemplation in making the marriage contract?

*Mrs. Ball* caused the arrest of *Roy* in order to exclude him from the barn, the findings suggest.   We fail to discover support therefor.   Instead, it appears that Mr. Ball rightly regarded *Roy* to be unsuitable to leave in control of the business and that it was essential to place some one else in charge.   He came to that without interference by his wife, so far as the record shows.   He consulted his former partner, Mr. Schliesman, in respect to the matter three days after the will was made, resulting in the latter procuring the man Mr. Ball desired to employ, to call.   Mr. Ball then acted entirely for himself in making the contract of employment; the employee,

as a condition of his accepting service, requiring the removal of *Roy* from the barn. To accomplish that without ground for objection on *Roy's* part, Mr. Ball sent him the amount due for wages and made Schliesman, not *Mrs. Ball,* the messenger to persuade *Roy* to vacate, which he refused to do; characterizing his act by very abusive language respecting his father. Failing of the purpose of his errand, Mr. Schliesman reported to Mr. and *Mrs. Ball;* first to the latter who suggested seeing a lawyer, very naturally, then to the former; giving the opinion that legal proceedings would be required. Thereupon Mr. Ball said to his friend that he would attend to the matter himself and not bother Mr. Schliesman further, called his wife in and repeated that in her presence, and then, after expressing full appreciation of his approaching end, asked Schliesman to bear witness to his wishes respecting his funeral and burial; giving specific directions regarding the same, and saying that his wife would pay his debts, indicating appreciation of the fact of her appointment to handle his estate.

The last of the three visits by Mr. Schliesman was four days after the will was made and he expressed the opinion that Mr. Ball then was as clear in mind as ever. If there be anything, characterizing the affair of *Roy's* being compelled to leave the barn, indicating that his father did not masterfully direct it himself and according to his own ideas, we cannot find it in the record. Why the suggestion that *Mrs. Ball* acted vindictively in the matter because she carried out her husband's directions, where necessary to aid what he, for good reasons, desired to accomplish?

The further circumstance is mentioned to show that *Mrs. Ball* perverted her husband's mind as to his children, that she gave her two-year-old claim against *Charles* for laundry work to a lawyer for collection. The debt was contracted before her marriage. *Charles* made no claim but that he owed it and testified that his father probably sanctioned her effort

to collect it. Why should not she have taken the course she did to coerce the young man into paying the bill he owed her for washing? It was contracted when he had no claim, moral or otherwise, upon her for gratuitous services. He was abundantly able to pay the bill. Why is there anything in the incident to the discredit of *Mrs. Ball?* Furthermore, as we read the evidence, contrary to the finding, the claim was not given to the lawyer for collection before a demand was made upon *Charles.* He testified, "She gave the claim to Charles Smith, attorney, after I refused to pay it." Mr. Ball may well have been indignant because of his son refusing to pay the laundry bill and thought to discipline him in the matter, as was done. Certainly the incident is not worthy of any consideration against *Mrs. Ball.*

As indicative of undue influence having been exercised and being active and efficient after the will was made, an incident of Mr. Ball having spoken in a very complimentary way to Mr. Schliesman in regard to the manner his wife was caring for him, considering his very bad condition which required close attention and services of a nature very difficult to obtain or render, all of which Mr. Schliesman had observed for himself; also the fact of Mr. Ball having requested that the making of his will might be kept secret, which was a perfectly natural thing, and other matters which, from our viewpoint do not fairly admit of any inference unfavorable to the proponent of the will.

It does not seem necessary to prolong the discussion. The only fair excuse for treating the case with so much fulness as we have is the fact, as it seems, that efficient undue influence was found from many circumstances which, as we look at the matter, hardly are of sufficient weight to arouse suspicion. Some really convincing evidentiary circumstances or direct evidence of undue influence is necessary in a case of this sort, particularly, where the alleged wrongdoer and the victim were husband and wife. Setting aside a man's will is a

very serious matter in any case. It should not be done on mere suspicion or inconclusive circumstances. Proceedings in respect to such a matter should be with special care, where testamentary capacity is evident and the result may lead to defeat an apparent purpose of the testator to make his wife his beneficiary on account of peculiar circumstances, and the amount of property involved is quite moderate. To turn incidents of such wifely attention to a husband in his last days as a capable, faithful woman in good health, may and would be naturally expected, to bestow, so as to have the cast of an attempt to perpetrate a fraud, would be going too far. It seems that the evidence was not considered from quite the proper legal standpoint,—that inferences of wrong doing were deduced from incidents which were natural, rightful, and commendable, and that the refusal to admit the will to probate should not be sustained.

*By the Court.*—The judgment is reversed, and cause remanded with instructions to reverse the judgment of the county court and to establish the will and remand the proceedings to such county court with directions for the settlement of the estate under the will. Costs taxed in this court to be paid out of the estate.

BARNES, J. (*dissenting*). In the opinion of the court it is in substance said that to exert undue influence over a person who is about to make a will amounts to the perpetration of a fraud, actual or constructive; that such fraud must be established by clear and satisfactory evidence; that the trial court acted upon the theory that the use of undue influence might be established by a preponderance of the evidence only; and that the judge having acted on a wrong conception of the law in arriving at his conclusions on the facts, the rule that findings of fact will not be disturbed unless against the clear preponderance of the evidence has no application to the case. Starting from this fundamental basis, the court proceeds to discuss the evidence as though the case were being tried *de*

*novo* in this court. The conclusion having been reached that undue influence was not proved by *clear and satisfactory evidence,* the court elaborates on the evidence favorable to the proponent and minimizes that favorable to the contestants, apparently overlooking the fact that where there was a legitimate conflict in the evidence the trial judge had the right to give credence to the evidence of the contestants if he believed it to be true, and overlooking the further fact that where conflicting inferences might be drawn from the testimony, those favorable to the contestants might be arrived at.

The writer has never been impressed with the soundness of the rule that fraud must be proved by clear and satisfactory evidence. It is not a rule of universal acceptance, nor is it one that has always found favor in this court. It throws a protective mantle over the *prima facie* wrongdoer and enables him to profit by his own wrong if the party claiming relief is unable to make out a strong case of injury. The reason for the rule, it is said, is that there is a presumption against wrong doing—of innocence, so to speak,—and that in order to overcome this presumption a higher degree of proof must be forthcoming than is ordinarily sufficient to warrant a recovery. It might, I think, be said with equal force that there is a presumption that the individual will not violate his contract or commit an assault and battery, or the crime of seduction under promise of marriage, or do a multitude of other things. Yet, where an action is brought to recover damages resulting from any of these acts, a preponderance of evidence is a sufficient basis for a recovery. This much is said, not because the writer thinks the rule of evidence in reference to fraud should now be changed by the court, but because it is thought that the rule is somewhat arbitrary and illogical, so much so that it should not be extended so as to cover a class of cases to which it has not been heretofore applied. If I read our decisions correctly, it is now held for the first time that a will cannot be set aside on the ground of

"undue influence" unless the proof of such "influence" is *"clear and satisfactory."* Such a rule, if adhered to, would make it well nigh impossible to set aside a will or deed for this cause. Such influence can hardly ever be proved by direct testimony. Those exercising it do not proclaim the fact from the housetops. It is secretly and often insidiously practiced. When found at all it must be by inference drawn from other facts. It is an incongruity to say that a thing must be proved by clear and satisfactory evidence and to say at the same time that it may be established by a mere inference, even if the inference is strong.

The sanctity of a will by which a testator disposes of his property is not greater than is that of a deed by which property is disposed of, in so far as the heirs or relatives of the deceased person are concerned. The cases all recognize the rule that the heirs at law of a decedent can set aside a deed or a will executed as a result of undue influence on precisely the same showing. The circuit judge in his opinion stated that the contestants made a *prima facie* case of undue influence, and, having done so, the burden was upon the proponent to show that the will was the testator's voluntary act. The opinion of this court is to the effect that, while this error might be excusable in view of what the court said in the cases of *Davis v. Dean,* 66 Wis. 100, 26 N. W. 737; *Disch v. Timm,* 101 Wis. 179, 77 N. W. 196; and *Vance v. Davis,* 118 Wis. 548, 95 N. W. 939, still those cases, correctly understood, do not support the conclusion of the trial judge; and it is further said that if any misleading expressions were used in these cases they were eliminated from our jurisprudence by the decision of this court in *Winn v. Itzel,* 125 Wis. 19, 103 N. W. 220, from which a lengthy quotation is made.

I think the circuit judge stated the law correctly and that it has been the settled law of this state for a long time that where one person stands in a relation of confidence and trust to another, and where the opportunity to exercise undue influ-

ence is shown to exist and where the disposition is likewise shown to exist, and it is further shown that an unnatural disposition of the property is made in favor of the party occupying the trust relation, a *prima facie* case of undue influence is made.

Such was the rule before *Winn v. Itzel* was decided. It has been the rule since that case was decided, and nothing is said to the contrary in that case, as I read it.

In *Davis v. Dean, supra,* it was said:

"We do not say that fraud and undue influence were proved affirmatively, but only that the circumstances suggest them. If the burden of proof is upon the plaintiffs to show such fraud or undue influence, probably we could not disturb the findings of the circuit court which negative their existence. But under the circumstances of this case the burden of proof is not upon the plaintiffs. Because Mrs. Sparrowk stood *in loco parentis* to George, and their relations to each other were those of trust and confidence, and because of the suspicious circumstances under which the conveyances were made, and the injustice which will be inflicted upon the heirs of the grantor if the conveyances are held valid, the law casts upon the grantee the burden of showing that the conveyances are untainted with undue influence or other fraud, but were the intelligent and deliberate act of the grantor. This rule is to protect the weak and unsuspicious from the cunning and fraud of those who stand in confidential relations to them, and has its foundation in good morals and sound public policy. The grantee has failed to satisfy the requirements of the rule, and the presumption of injustice, fraud and wrong stands against the conveyances, which he must remove before the court is authorized to say that they are valid. This he has not done, and for that reason, also, his deeds must be canceled and held for naught."

In *McMaster v. Scriven,* 85 Wis. 162, 55 N. W. 149, the above rule was recognized, but was held not to apply to that case because the beneficiary in the will did not stand in a fiduciary relation to the testatrix, and therefore the burden of showing undue influence was upon the contestant of the will.

In *Cole v. Getzinger,* 96 Wis. 559, 573, 71 N. W. 75, it was said:

"The general principle is that where, from the nature of the transaction and the situation and relation of the parties, fraud and imposition may be presumed, unless their presumption be rebutted, relief will be granted in equity, although fraud in fact be not proved."

That portion of the opinion in *Davis v. Dean* above quoted is also quoted in the opinion in this case and is approved.

In *Doyle v. Welch,* 100 Wis. 24, 27, 75 N. W. 400, it is said:

"The salutary rule that, where a voluntary conveyance is made by an aged person of his entire property, without consideration, to one who stands in a position of trust and confidence to him, under circumstances of secrecy, the burden of proof is upon the grantee to show that the conveyance was untainted with undue influence or fraud, has been frequently laid down by this court."

In *Disch v. Timm,* 101 Wis. 179, 77 N. W. 196, the case of *Davis v. Dean* was again considered, and the doctrine quoted therefrom was expressly approved, and the principle is approved in *Will of Slinger,* 72 Wis. 22, 37 N. W. 236.

In *Small v. Champeny,* 102 Wis. 61, 78 N. W. 407, the court uses the following quotation taken from the case of *Disch v. Timm, supra:*

"When opportunity and the disposition to influence the act of another are shown, a presumption of undue influence arises, and the burden of proof is then on the party charged therewith to show that such other acted intelligently and voluntarily."

In *Fox v. Martin,* 104 Wis. 581, 80 N. W. 921, the rule is again fully recognized, but was held not to apply in that case because the beneficiaries under the will did not stand in a confidential relation to the testator.

In *Loennecker's Will,* 112 Wis. 461, 467, 88 N. W. 215, the court again held that in order to raise a presumption of undue influence in making a will, which throws the burden

of proof upon the beneficiary, there must be shown a subject susceptible to such influence, clear evidence of opportunity, and a disposition on the part of the beneficiary to exercise such influence. It is said:

"When these facts are shown to exist, and especially when they exist with other facts out of the usual course of business transactions of such a nature, the presumption will arise which will put the beneficiary to his proof of good faith and freedom from undue influence. Whether the testimony shows these preliminary facts with sufficient clearness and certainty is a matter to be decided by the trial court."

In *Vance v. Davis,* 118 Wis. 548, 551, 95 N. W. 939, the court used the following language:

"Absence of such direct proof is, however, not final, for, in apparent contradiction of the ordinary rule requiring clear and direct proof of fraud, this and other courts have recognized the necessity of casting the burden of negative proof upon one who profits from a position of confidence and control by a conveyance of such character and made under such circumstances as to suggest improbability that it is the free act of the grantor, and probability that it is due to influence of the beneficiary, which his confidential relation makes easy, but renders difficult or impossible of direct proof."

Referring now to the case of *Winn v. Itzel,* 125 Wis. 19, 103 N. W. 220, I do not understand that it lays down any doctrine that is contrary to the cases above referred to. It simply holds that, where the party attacking a will or a deed has made a *prima facie* showing, the other party must offer evidence to show that no undue influence was exercised, and that on the whole case as thus made up the burden of proof rests upon the plaintiff to prove the undue influence. The words "burden of proof" as used in the prior cases are not of course to be understood in their exact technical sense. The plaintiff in any case has the burden of proof on his affirmative allegations of fact from beginning to end of the case; strictly there is no shifting of this burden, but when the plaintiff has made his proofs and the defendant takes up the

case, he takes the laboring oar and has for the time being the "burden" of the controversy, and in this sense the words are used. This distinction was, it seems, fully explained in the *Itzel Case*. As I read that case, it was not intended thereby to change any established principle theretofore laid down. In that case the trial court had evidently understood that the "burden of proof" in its strict and technical sense was shifted in a case of alleged undue influence, when the plaintiff had shown the required relation, opportunity, disposition to influence, and the unnatural disposal of property, and had required the defendant to assume the affirmative at this point, and then allowed the plaintiff to come in with additional affirmative proof of undue influence at the end of the defendant's testimony. This method of trying the case was condemned, and it was shown that the burden of proof in its strict sense remained with the plaintiff on his affirmative allegations from beginning to end of the case as in other cases, and that the plaintiff should put in all his evidence both direct and circumstantial in making his case. This was what was decided in the *Itzel Case* as I understand it, and nothing further.

The case of *Boyle v. Robinson,* 129 Wis. 567, 109 N. W. 623, is to the same effect.

In the still later case of *Quinn v. Quinn,* 130 Wis. 548, 110 N. W. 488, it was held that in case of a conveyance by an aged person susceptible to undue influence, of his entire property without consideration, to one in a position of trust and confidence, under suspicious circumstances which satisfactorily suggest the wrong, accompanied by proof of opportunity and disposition on the part of the beneficiary to exert influence, there arises a presumption that the conveyance was so induced, unless the grantee can negative that fact by direct proof. This was an action brought by the heirs of a deceased intestate to set aside a deed made by decedent in his lifetime.

So I think it clearly appears from our former decisions that the trial judge was standing on solid ground when he reached the conclusion that it was incumbent on the contestants in the first instance to make out a *prima facie* case only, and that they were entitled to judgment unless their *prima facie* proof was overcome by evidence offered on behalf of the proponent. I have been unable to find a single case dealing with undue influence, among the many decided by this court, where it has ever before been intimated that the rule of evidence applicable to fraud applies. On the contrary, the burden of showing good faith and honest and fair dealing is thrown on the party who unduly profits by the will of a deceased person, where the parties occupy a position of trust and confidence toward each other and where opportunity and a disposition to exercise such influence are shown to exist. Changing a prevailing rule of evidence to help out a woman who after living for a time in "honorable widowhood" marries an old man from philanthropic motives has its drawbacks. We do not know how soon we will have a case where an artful, designing woman may marry an old man who is a victim of chronic alcoholism and whose days are numbered, for the purpose of securing the property which in good conscience should go to others, and when such a case does arise we will not be proud of the innovation.

I think the circuit judge is accused of carelessness in making findings of fact of which he is not guilty. I quote:

"In the opinion [of the circuit judge] the net estate was placed at $3,500, while, as before indicated, the figures were raised to $4,500 in the findings."

And further: "The findings are to the effect that the net estate was of the value of $4,500, but that seems clearly contrary to the evidence to the extent of more than $1,500," etc.

It is said that the estate is not worth, above debts, to exceed $3,000, and that the matter of expense of administration and of an allowance for the widow pending settlement was entirely overlooked. This latter statement is mere surmise.

What the trial judge said in his opinion was that the "will attempts to give all of his property, which, over and above debts, will amount to *about $3,500,* to the widow, who married deceased a little before his death and had no part in the accumulation of the property, and to disinherit his three children, who appear always to have been dutiful and affectionate and from whom he had never been estranged." No doubt the figures were given from memory and purport to be only an approximation, and vary but $500 from what this court finds to be the true amount. As a matter of fact the trial court did not overstate the net value of the estate, unless proof of the fact that certain claims had been filed against the estate was proof that such claims were owing. There was *prima facie* proof of unsecured claims to the amount of $900, and no more.

Turning to the findings which are said to be in conflict with the opinion rendered, they neither pass upon nor purport to pass upon the net value of the estate. The reason for this is obvious. The contestants were successful. The largest unsecured creditor was the proponent herself. Her claim exceeded the claims of all the other unsecured creditors combined. The court was careful not to make any finding in reference to claims which would stand in the way of contesting any unsecured claim. What the court does find is that the testator "had accumulated property which at the time of his death was of the value of about $6,500, against which there was an indebtedness of $2,000 *secured by mortgage on his real estate."* The proof showed that there were outstanding real-estate mortgages on which there was $1,900 principal and $100 interest due. There was no disposition, apparently, to question the *bona fide* existence of this indebtedness, so the amount of it was stated.

The circuit judge found (1) that the opportunity existed to unduly influence the testator; (2) that he was susceptible to such influence; and (3) that such influence had been exerted upon him. If these conclusions of fact are not against

the clear preponderance of the evidence, the judgment setting aside the will should not be reversed. It might be remarked here that the county court reached the same conclusion as did the circuit court. The judges of both of these courts had the superior advantage of seeing and hearing the witnesses, and this court should not disturb their conclusions on questions of fact unless it satisfactorily appears that the clear preponderance of the evidence is against them.

There is no doubt that the proponent of the will, living alone as she was with the testator who was on his death bed, had all kinds of opportunities to influence him if she so desired.

I think there is little doubt that the evidence warranted the conclusion that the testator was susceptible to undue influence. He was past seventy years of age when he made his will. He had daily consumed large quantities of alcoholic liquors for twenty years or more, gradually increasing the amount of consumption as he grew older. His drinking habits produced cirrhosis of the liver, as well as a badly diseased condition of the stomach and bowels, from which he died within less than a month after the time of making his will. He was also suffering from an open fistula. Diseased as he was, whisky was necessary to his existence up to the end of his life, so much so that his physician prescribed its use in moderate quantities. He was suffering much pain. While occasionally there were flashes of the old fire, it was very apparent that his once strong and robust constitution had become shattered by the long and excessive use of intoxicants and by the complication of diseases that resulted therefrom. These facts are undisputed and indisputable. The strong, self-reliant, and positive character had fought a long battle with a more powerful enemy than himself, and towards the end, with shattered nerves and three badly diseased vital organs, he was forced to succumb in the unequal contest. It may be admitted that he talked sensibly and naturally to the

attorney who drew his will.   This attorney, however, was practically a stranger to him, who had no opportunity to know him as he once was, and had little opportunity to know whether he was expressing what would be his wish if he were his old self or was expressing the desire of the strong self-confident person in whose keeping he was.   The testator also talked rationally to his old partner, Schliesman, a couple of days after he made his will.   This fact would be important on the question of his sanity, but has very little to do with the claim that he was in such a condition as to be easily dominated and controlled by his wife, on whom he was obliged to call for care and attention during his last illness.   It was not necessary to resort to the testimony of experts to show that his mind and his will power were deeply affected by alcohol and disease.   The dominant facts stand out that as dissolution approached the victim was racked with pain and was supplied with liquor, and that his condition was brought about by the continuous and excessive use of stimulants.   He was unable to sign his name to his will in such a way that those who were familiar with his signature could recognize it.   My observation as to the effect of disease and alcoholism is not such as to justify me in saying that the conclusion reached by the county and circuit judges is against the clear weight of the evidence.   On the contrary, as an original proposition I should be inclined to say that the conclusion of these two judges was the most rational one to draw, and the evidence of the expert witnesses was ample to sustain it.

Susceptibility to influence as well as opportunity to influence having existed, the last, and, it may be admitted, the closest, question remains to be considered, and that is, Was advantage taken of the opportunity?   The exercise of undue influence can rarely be proven by direct evidence.   It is not usually exerted in the presence of a third person.   The proponent and the testator were living alone, so that direct proof was impossible.   In most of the decided cases upon this ques-

tion where undue influence was found, it was deduced from other facts and circumstances established by the evidence. Were sufficient facts shown here?

Perhaps the strongest fact shown was that the proponent married the deceased. At the time of the marriage he was sixty-nine years old and she was some eighteen years younger. She had been twice married and had some property, at least a house and lot, and $900 which she loaned to the testator before the marriage. After the first Mrs. Ball died in 1905, proponent kept house for the deceased for two and a half years. She knew that he was old and that he had been a steady heavy drinker for many years; that in all probability he was past reformation, and that without it his days were practically numbered. He might live a few months, possibly a few years, but the chances were very much against his being able to live very long. She hardly married him for love. She did not need to marry him for a home, because she had one of her own. She might have taken pity on him and thought she could reform him, but she probably had better sense at her age in life. At least the most plausible explanation of her action is that she knew she would at least get some of his property and perhaps all of it. If the task was uninviting, the time of it might be short and the reward ample. This inference may be obnoxious, but it does more credit to her good sense and good judgment than any other that occurs to me.

The testator made an unusual if not an unnatural disposition of his property. Its value, after deducting claims filed and mortgages, was substantially the amount found by this court, if it be conceded that proof that claims to a stated amount were filed against the estate is *prima facie* proof of their correctness. All of the property was given to the widow. The deceased left a life insurance policy which was payable to his first wife or her heirs, on which $1,100 was collected, which sum was divided among the three children.

He attempted to assign this policy also to his wife, but found that he could not do so without the consent of the beneficiaries.

The parties had been married but fifteen months at the time the testator died and all of his property had been acquired before the marriage. There was testimony tending to show that the proponent was not only endeavoring to prejudice the deceased against his children, but that she succeeded in doing so. At about the time the will was made or within a day or two thereafter she had the son *Roy* arrested because he refused to leave the livery stable and he was fined a few dollars and sent to jail in default of payment of the fine. The other son, *Charlie,* testified that she told him she would fill *Roy* full of lead if he came around the house.

During part of the two and a half years that she acted as housekeeper *Charlie* lived in the family with his father and she did the family washing. A short time before the will was made she placed a bill for the washing in the hands of her attorney for collection. *Charlie* further testified that when his father was first taken ill she told him point blank over the telephone that she would not allow him to see his father, and that he was unable to see him until ten days or two weeks thereafter, at which time he was very low and paid little attention to what was going on.

The testator and his children had always been good friends until a few months before the death occurred. *Roy* had contributed $600 to the livery business which his father carried on at one time, but the claim is now barred by the statute of limitations. *Charlie* had contributed $300. His claim is also barred. The making of the will was kept secret. This in itself, if not a badge of fraud, "is surely a badge of undue influence." *Watkins v. Brant,* 46 Wis. 419, 425, 1 N. W. 82; *Cole v. Getzinger,* 96 Wis. 559, 572, 71 N. W. 75; *Fox v. Martin,* 104 Wis. 581, 593, 80 N. W. 921. The proponent was active in securing the execution of the will. This

is a persuasive badge of undue influence. *Will of Slinger,* 72 Wis. 22, 37 N. W: 236; *Smith v. Henline,* 174 Ill. 184, 51 N. E. 227; *Sullivan v. Foley,* 112 Mich. 1, 70 N. W. 322. Another circumstance worthy of mention is that the attorney for the proponent was called in to draft the will, he being a comparative stranger to the testator. There were some other minor circumstances which the court might properly have taken into account in reaching the conclusion which was reached.

It is true that the proponent denied or explained the most damaging testimony that was given by the two sons, but it is none the less true that there was a question of veracity involved between the witnesses and that the court saw them and heard them and might believe the sons and disbelieve the widow. I am unable to arrive at the conclusion that the inference that undue influence was exercised upon the testator is against the clear preponderance of the testimony, and I think the judgment should be affirmed.

The following opinion was filed April 21, 1913:

Winslow, C. J. (*dissenting*). The circuit judge who tried this case tried it with his usual care and ability, and wrote a comprehensive opinion which demonstrates his close study of the case. In my judgment there is no foundation for the thought that he applied any wrong rule of law to the case. The rule is that when a plaintiff or contestant in such a case as this has shown (1) a person unquestionably subject to undue influence, (2) opportunity to exercise such influence, (3) a disposition on the part of the person charged to exert the influence, and (4) a result clearly appearing to be the effect of the supposed influence, he has established a *prima facie* case of undue influence which must be met, or it will prevail. I do not understand that this rule is shaken or questioned in this case.

Let it be admitted, as held in the opinion, that these four facts must be proven by clear and satisfactory evidence before the *prima facie* case is made, still I think the trial judge's opinion clearly shows that to his mind these four facts were so proven.

As to the first fact he says:

"Examining the evidence in this case, I find that the testator was at the time of and just before making his will a person susceptible to the influence of one in whom he might repose confidence or upon whom he might be dependent.

"He was seventy years old, was and for some time had been greatly enfeebled by disease, had for many years used intoxicating liquors excessively, particularly in the later years, his alcoholism had brought upon his fatal and now rapidly progressing disease of the liver, the final stage of which is cirrhosis and cessation of function. His physical system was giving out in many particulars. For months he had been unable to go to his place of business except by conveyance, and two days before making his will retired to his home and his bed, never again to leave his room alive. There can be no doubt that in his then enfeebled condition, no matter how strong had been his character before, he must have felt helpless and dependent and easily subject to any strong influence that might be brought to bear."

A fact about which there can be no doubt must certainly be one that is proven by clear and satisfactory evidence.

As to the opportunity there is no dispute; as to the disposition the judge says:

"It appears that the proponent had the capacity and disposition to exercise strong influence. She was a vigorous and strong-minded woman of fifty-one years. Her marriage to the deceased was her third. She appears to have considerable business capacity. Her marriage to the deceased when he was nearly seventy years old, broken in health and burdened by age and his bad habit of alcoholism, was either very self-sacrificing upon her part or the result of a design to financially profit by the marriage. It seems to me it was the latter. She took the deceased completely into her charge and to her

own home and showed a disposition to disconnect him from his children, particularly as he neared the end. Her employment of an attorney to collect of the son *Charles* a laundry bill, claimed to have been incurred two or three years before, without previously asking for payment and without *Charles* knowing that he was indebted, seems much like an effort to put *Charles* at arms'-length. She made herself acquainted with the business of the deceased, and about the time of the execution of the will, or soon after, acted vindictively in dismissing the son *Roy* from the livery business. From the time when deceased became confined to his house until after he was too ill to consider business the sons had no opportunity to see the father, and opportunity was by proponent at least on two or three occasions refused. She was active in making arrangements for the drawing of the will, and the attorney was called whom she had personally employed to collect the laundry bill against *Charles*. All things considered, I feel that the ability and disposition on the part of proponent to get from the deceased all property she could, existed."

The array of facts above stated, all of which are amply proven, point irresistibly to the conclusion that the disposition to influence existed in this case, and I construe the circuit judge's words as meaning that he so concluded.

As to the fourth fact he says: "Lastly, the will made and here propounded appears *clearly* to have been the effect of some strong influence on the deceased," and he then collates the facts which seem to him to demonstrate this fact.

So we have the second of the necessary facts, *i. e.* opportunity, admittedly existing, and of the other three we have the circuit judge's deliberate statement that as to the first there is "no doubt," as to the third "it appears," and as to the fourth "it appears clearly." In view of these declarations of the trial judge, it seems to me there is no room to say that he applied any wrong rule of law to the case.

No one questions the sacredness of a will, nor the importance of upholding the right of every man to make his will and have its provisions faithfully carried out. It should be re-

membered at the same time that it is just as important that a document which is not in fact the will of the testator, but is the expression of the wishes of a strong and cunning mind which has overpowered the mind of the testator, should be set aside.

The trial judge decided, after seeing the witnesses and carefully considering the evidence, that the latter case was the case presented here. I think his decision should be affirmed unless we are ready to say that our oft repeated declarations of the dignity to be given to a circuit judge's findings of fact are to become mere sounding proclamations.