ANDERSON, Respondent, vs. LAUGEN and others, Appellants.

*April 20—May 10, 1904.*

(1, 2) *Witnesses: Competency: Transactions with persons since deceased.*  (3) *Remote evidence: Immaterial error.*  (4) *Wills: Undue influence.*

1. A witness incompetent under sec. 4069, Stats. 1898, as amended by ch. 181, Laws of 1901, to testify to transactions or communications by him personally with a person since deceased, is not competent to testify to transactions or communications between the deceased and third persons in his presence, unless it appears that he did not participate therein and that they were not affected by his presence.

2. The person named as executor in a will, who appears as proponent in a contested proceeding for its probate, with no other interest in the estate of the deceased, is not incompetent, under sec. 4069, Stats. 1898, as amended by ch. 181, Laws of 1901, to testify to personal transactions or communications with the deceased.

3. The exclusion of testimony as to facts remote in point of time and of slight, if any, relevancy to the issues, *held* not a material error.

4. To show that the execution of a will was procured by undue influence, it must appear that there was such influence exercised as to amount to moral coercion, which resulted in destroying the testator's free will and independent action, and constrained him to act against his will and independent wishes in disposing of his property.  The evidence in this case is *held* to sustain the finding of the trial court that there was no undue influence.

APPEAL from a judgment of the circuit court for St. Croix county: E. W. HELMS, Circuit Judge.  *Affirmed.*

This is a proceeding, brought in county court to probate the will of Elias E. Laugen.  Elias E. Laugen was a resident of St. Croix county, this state.  He died November 27, 1901, at the age of seventy-six or seventy-seven years.  The paper offered as the last will of the deceased is dated the 12th day of August, 1901.  It appears to have been properly signed by him, and attested by two witnesses in his presence and in

the presence of each other. The proponent, *Henry Anderson,* is named as executor. The contestants are the children of the deceased. The paper was drawn up by *Mr. Anderson* at his office, at the request and in the presence of the deceased, on the day it bears date. At the same time and place a contract was made and executed by Edan and Hannah Green, his wife, the beneficiaries in the will, stipulating that they would support the deceased so long as he should live, upon the terms and conditions therein expressed. The consideration of this agreement was the payment of the sums therein specified, and that whatever property remained at the time of his death should be left to Edan and Hannah Green.

Elias E. Laugen came to America in 1866, settling in St. Croix county, where he acquired a small farm, part of which he owned at the time of his death. He had been married. At the time of his death he left surviving him five sons and two daughters, the oldest fifty years of age and the youngest twenty-nine. His wife died in 1889. She had been an invalid for a considerable period before her death, and during the later part of her life was a helpless invalid and feeble-minded. During the year 1885, while residing on his farm, with his wife, who then required personal attention and care in her enfeebled condition, Elias E. Laugen went to his old home in Norway to secure the services of some person to assist him in caring for his wife and maintaining his household. He claimed that this was necessary because his children refused to perform for him such services as the circumstances demanded. He visited his sister Eliza, in Norway, and by arrangement with her and her husband secured the services of their daughter, Hannah Gunderson, then twenty years of age, who accompanied him to America. His sister Ricka Laugen, twenty years of age, also came with him to his home in St. Croix county. The deceased at this time was sixty-two years of age. Upon reaching his home, the niece, Hannah Gunderson, and his sister Ricka performed the household

work and cared for Mrs. Laugen. His sister soon secured employment elsewhere. His son, *George,* lived with them for a short time, but left on account of some disagreement with his father. Thereafter the niece, Hannah, performed the duties of the household and cared for Mrs. Laugen.

One Edan Green, who came with the deceased, his sister, and niece from Norway, worked the farm of deceased the following year, and then married the niece, Hannah. For the eleven succeeding years Green and his wife, Hannah, occupied and worked the farm of the deceased, and helped care for Mrs. Laugen, who had become very feeble and required constant care and attention, until her death in November, 1889. In 1889 he conveyed the homestead forty to Edan and Hannah Green, pursuant to a contract therefor, made with him, for their services to himself and wife and the payment of other consideration. The deceased continued to live upon the farm with Mr. and Mrs. Green until 1897. At this time he separated from them on account of some feeling of dissatisfaction toward the Greens. After this removal he lived at various places with friends and some of his children, and during the later part of the period occupied alone a small house, which he had built for himself in the summer of 1901. While living in this house Green's daughter assisted him some during the months of July and August, 1901. In August he again removed to the home of the Greens, and arranged with them, under the agreement referred to, that they care for and support him for the remainder of his life. During the period he did not live with the Greens, from 1897 to 1901, he seems to have had but little intercourse with his children, and they showed no interest in him and his affairs. It appears that he and his children had no intimate relations or friendly feelings toward each other.

It is charged by his children that the paper writing purporting to be the last will was procured to be made and executed through the undue influence of Mr. and Mrs. Green.

It is shown that when he returned to live with the Greens in August, 1901, his health was somewhat impaired, and that he was unable to properly care for himself.   Within a few days after returning to live with them, he and Mrs. Green went to the office of *Henry Anderson,* at Baldwin, to make some arrangement for compensating the Greens for his care and support.   Mrs. Green then refused to enter into a contract upon condition of the making of a will like this in question, on account of the trouble it was likely to cause between them and his children.   He and Mr. and Mrs. Green returned to the office of *Henry Anderson* about a week thereafter, and the will and contract were then made and executed.   At this time the deceased gave *Mr. Anderson* the terms of the arrangements, directed that the papers be drawn, and executed them after they were read and explained to him.   He expressed his approval of them in the presence of the parties and of those who witnessed them.   He then returned with the Greens to their home, and lived with them as a member of their household until his death.

Upon appeal from the county court, where the will was admitted to probate, the circuit court affirmed the judgment probating the will.   This is an appeal from such judgment.

*A. J. Kinney,* for the appellants.

*James A. Frear,* for the respondent.

SIEBECKER, J.   Appellants urge as error a number of rulings upon the reception and rejection of evidence.   It is complained that the court refused to permit some of the contestants to testify as to numerous statements and transactions with the deceased personally, or with some one of the other contestants in their presence, and that the court erroneously struck out evidence of like nature.   An instance of the class of evidence excluded by the court is the following: The daughter *Emma* testified that she did not remain at home after her father secured the services of his niece.   In ex-

planation of this she was asked: "Q. Did you ever tell your father or offer to him to come home again and take care of your mother at home?" An objection to this question was sustained upon the ground, among others, that it called for transactions or conversations with the deceased. The ruling was clearly correct, under sec. 4069, Stats. 1898. Proponent had in no way waived the right to insist upon this objection, and the evidence was therefore properly excluded. The court excluded other declarations and transactions between deceased and some of his children in the presence of other children, who were called to testify on the subject. It is claimed that this testimony was competent, under the ruling in *Wollman v. Ruehle,* 104 Wis. 603, 80 N. W. 919, where it was held that this statute "does not forbid testimony of transactions or communications between the deceased and third persons, though in the witness's presence, if he did not participate therein, and they were not affected by his presence." It will be observed that, to make the witness competent, it is essential that he did not participate in the transactions or communications, and that they were not affected by his presence. These conditions become most important when the witness is a party and interested in establishing the communication in support of his contention in the controversy. The record does not justify the assumption that the witnesses, who were adverse parties to the proceedings, did not participate in the transactions or communications sought to be established by them, or that they were not affected by their presence. It also appears that other evidence was received, subject to objection, which covered the facts suggested as embraced in these transactions and communications. This evidence was not stricken out or excluded by the court from its consideration in finding the facts upon the controverted issues. *Brader v. Brader,* 110 Wis. 423, 85 N. W. 681; *Morgan v. Henry,* 115 Wis. 27, 90 N. W. 1012.

Other exceptions are urged to rulings excluding some state-

ments of Hannah Green tending to show she was active in keeping the children and father separated; and also to rulings excluding explanations of the children as to why they did not minister to their mother's comfort in the years before her death. These facts were so remote in point of time, and of such slight relevancy, if any, that their admission would afford practically no weight in determining the issues between the parties.

The testimony of *Henry Anderson* was received over objection as to his competency, under sec. 4069, Stats. 1898. As heretofore stated, he was designated by the deceased in the proposed will as the executor, and is the proponent of the will in this proceeding. This section, as amended by ch. 181, Laws of 1901, provides:

"No party in his own behalf or interest and no person from, through or under whom a party derives his interest or title, shall be examined as a witness in respect to any transactions or communications by him personally with a deceased person . . . in any civil action or proceeding in which the opposite party derives his title or sustains his liability to the cause of action from, through or under such deceased person," etc.

The question arises: Is *Mr. Anderson,* the executor named in and the proponent of the alleged will, incompetent to testify to personal transactions or communications with the deceased in the proceedings for the probate of the will? It appears that he is not a legatee. If he is an incompetent witness, it must be as a party to the proceeding for the probate of the will. The statute, before the amendment in 1901, declared in unqualified terms that "no party" to an action or proceeding shall be examined in respect to a personal transaction or communication with a deceased person under the circumstances covered by the statute. It would seem that the statute as it then stood embraced all persons who properly appeared as parties on the record to an action or proceeding. Executors and administrators have been treated as parties to

such proceedings in this state, though their interests differ from those of the heirs and the legatees and devisees under wills. *Kasson v. Brocker's Estate,* 47 Wis. 79, 1 N. W. 418; *Sawtelle v. Ripley,* 85 Wis. 72, 55 N. W. 156. But the amendment provides that no party shall be examined as a witness in his behalf or interest under the circumstances mentioned in the statute. This surely was intended to modify the terms of the statute in some respects. It seems evident that the purpose of the amendment was to limit the original language of the section, which embraced all parties. The words of limitation indicate that the legislature intended to restrict its operation to parties who had a beneficial interest in, or sustained some liability under, the subject matter of the controversy. Tested under this rule, the person named as executor in a proposed will, who appears as proponent in a contested proceeding, with no other interest in the estate of the deceased, has no beneficial interest in, nor sustains any liability under, the subject of the controversy, though he is a nominal party to the proceeding. Up to the time of the probate of the will, he could have no vested or contingent interest in the subject of the controversy, because he is not then executor, and can only become such after probate of the will and the issuance of letters testamentary. If he is then called as a witness in the proceeding for the probate of the will, he cannot be deemed to testify as a party in his own behalf or interest. Upon these considerations we hold that *Henry Anderson* was a competent witness in the proceeding for the probate of the will.

It is contended by appellants that the execution of the will was procured by the exercise of undue influence over the deceased by Edan and Hannah Green, the beneficiaries. To sustain this contention it must appear that there was such influence exercised as to amount to moral coercion, which resulted in destroying the testator's free will and independent action, and constrained him to act against his will and in-

dependent wishes in disposing of his property. Contestants
lay much stress upon the claim that the evidence clearly shows
that the beneficiary Hannah Green had an undue influence
over the deceased in persuading him to yield to her wishes
and importunities in bestowing favors and pecuniary benefits
upon her. It is claimed that she manifested a disposition to
unduly persuade him to disregard his duty toward his chil-
dren, and that she had full opportunity to carry out her
wrongful purpose of depriving them of the natural bounty
of their father, and that she wrongfully persuaded him to
believe that they would not care for him in his old age, and
that she thereby induced him to live with her and her hus-
band upon the condition that he devise his estate to them.
The evidence shows that the deceased was of sound mind and
fully capable of making a will. It is insisted that the bene-
ficiary Mrs. Green was enabled to exercise this undue influ-
ence over the deceased because they lived in adulterous rela-
tions after she came to his home with him from Europe. The
assertion is not borne out by the proof. All the facts and
circumstances of the case tend to refute it. As appears from
the foregoing statement of facts, the deceased was an uncle
of Mrs. Green. He was esteemed and respected by those who
knew him intimately. He obtained the consent and approval
of her parents to have her perform the household duties for
him and to care for Mrs. Laugen in her enfeebled condition.
This she did for a year after she came from Europe. In the
following year she was married to Mr. Green, and for a num-
ber of years they lived together and worked the farm of the
deceased under an agreement, caring for his invalid wife and
maintaining him in his home. All the facts and circum-
stances of the life of the family, consisting of herself and
husband, a family of children, and the deceased, fail to raise
any suspicion of an adulterous relation. The claim rests
upon the bare assertion of one of the contestants, who states
that shortly after his father returned from Europe, he on one

occasion observed relations of an adulterous character. An examination of the evidence shows that it does not establish the fact, and that the trial court must have so found in determining the issues.

It is furthermore asserted that she unduly importuned the deceased to return to the home of the Greens in the month of July, 1901, and induced him to make the will in question. This contention is also untenable upon the evidence. In so far as there is any testimony upon these subjects, it strongly tends to show that Mr. and Mrs. Green were reluctant to again take the deceased into their home after his absence of about two years; and that it was the free wish and desire of the deceased to live with them under the arrangement expressed in the written contract. The declarations of the testator at various times to different persons, when he was under no coercion or restraint to speak his free will and desire in the matter, is in accord with these conclusions from the facts.

Another reason urged showing undue influence is that it is unnatural for a father to disinherit his children and bestow his bounty upon strangers. Ordinarily, the argument possesses merit, but it has no force in this contest, in view of the facts of the case. As stated, the contestants and their father did not maintain and live in the usual friendly and helpful relationship of parent and children, and the deceased found in his niece, Mrs. Green, and her husband the willing hands to help him when trouble and misfortune overtook him and the infirmities of old age were at his door. Under the circumstances it cannot be said that he bestowed his property upon persons who had no claim to his bounty. He had depended upon them, and they had helped him at times, which brought them into relationship as close as family ties; and in the end he exercised the care and prudence of arranging with them, as a condition of making the will, that they must maintain and comfortably support him for the remainder of his days. An attentive perusal of the evidence and a full

consideration of the facts leads to the conclusion that the trial court must be sustained in its conclusion that no undue influence or restraint was exercised over the mind of the deceased when he made and executed the will in question.

*By the Court.*—Judgment affirmed.