Will of Keenan: Hayden, Appellant, vs. Nuzum and others, Respondents.

*January 13—March 9, 1920.*

*Wills: Testamentary capacity: Evidence: Charities: Trust pro-
viding free medical dispensary: Certainty as to beneficiaries:
Trial: Advisory verdict: Withdrawing issue from jury: New
trial: Testimony which would not change result: Appeal:
Harmless error: Excluding cumulative evidence: Error in
instructions on advisory verdict.*

1. In a proceeding for .the probate of the will of an aged widow,
   the evidence is *held* to sustain the conclusion of the court
   that testatrix was of sound and disposing mind when she
   executed the will and the codicils attached thereto.
2. The verdict of the jury in this case being advisory only, the
   court was not bound by it, and could change the answers of
   the jury to special questions when it found they were not
   supported by the preponderance of the evidence, and was not
   required to submit the issues of fact to another jury.
3. Since the questions litigated were ultimately decided by the
   court contrary to the verdict of the jury, alleged errors in
   instructions need not be considered.
4. Where there was much testimony of the same nature by persons
   having had personal transactions with testatrix, the exclu-
   sion of the testimony of a witness as to the loss of mind of
   testatrix and her inability to understand and comprehend
   ordinary details concerning business and property was not
   prejudicial.
5. There being no evidence to sustain the claim that the will was
   the result of undue influence, the court properly withdrew
   the inquiry on this issue from the jury.
6. Excluded testimony and newly discovered testimony bearing
   on the testamentary capacity of testatrix are *held* not such as
   to call for a different finding on the subject.
7. The residuary clause of the will giving the residue to trustees
   who were to establish and carry on one or more free medical
   dispensaries, etc., is not subject to the. objection that it was
   uncertain as to beneficiaries, contradictory in terms, and con-
   ferred on the trustees' powers in conflict with the law, so as
   to remove them from the supervision and control of the
   courts.

Appeal from a judgment of the circuit court for Mil-
waukee county: W. J. Turner, Circuit Judge. *Affirmed.*

This is, an appeal·by *Mortimer M. Hayden,* contestant of the proposed will of Antoinette A. Keenan, from a judgment affirming a judgment of the county court of Milwaukee county admitting to probate the alleged will, with two codicils, of the above-named testatrix.

On July 25, 1915, a petition for the probate of this will and codicils was presented to the county court by *R. Franklin Nuzum,* who is named as executor by the first codicil. *Mortimer M. Hayden* filed objection to the probate of the alleged will upon the following grounds:

(1) That Mrs. Keenan had not testamentary capacity to make the will and codicils when they were executed; (2) that the execution of the will and codicils was procured by undue influence exerted by *Nathan Pereles, Jr.* On the trial the contestant also objected to the probate of the will upon the grounds that the provisions attempting to create a trust are void and hence the whole will is invalid.

The will was probated in the county court without a trial of the issues raised by the objections to its probate.

Mrs. Keenan is the widow of Mathew Keenan, who had resided in Milwaukee for many years and died there in 1898. He died intestate and left no children. Mrs. Keenan as his sole heir inherited his estate, which was valued at $276,513.24. When Mrs. Keenan died the estate had increased in value to over $403,000. Mrs. Keenan was about ninety years of age when she died. Her heirs at law consisted of a brother, who died before the trial in the circuit court, nephews, nieces, grandnephews and grandnieces, most of whom lived at long distances from Milwaukee. She manifested a high regard and respect for her husband, and after his death managed the estate she inherited from him through agents and controlled its investment and use up to the time of her death. During her widowhood she manifested a desire and expressed an intent to devote the estate she and her husband had accumulated to perpetuate his memory in the form of a charitable bequest. From the

time of her husband's death in 1898 to 1907 she gave her business affairs close personal attention. In 1907 she suffered a severe illness which impaired her physical capacity to an extent that she was then dependent on others to assist her in her business matters and thereafter required the attendance and service of others to provide her with bodily comforts. She continued to participate in the control of her estate and in the investment and expenditure of her moneys. She maintained her membership in church and club organizations and contributed to religious and charitable organizations in which she was interested. In her personal characteristics she was domineering and critical of those about her or in her service; she was acquisitive in money matters to an extent that made her penurious and avaricious, except on occasions when she gave to public benevolences in which she had a personal interest. In her intercourse with persons about her during the latter part of her life she was irritable, cross, and subject to fits of violent anger without seeming grounds for provocation. But she maintained her business and household relations with practically the same persons during her widowhood and persisted in retaining them as trusted agents, counselors, and friends. After 1907 she was unable to leave her bed or walk about the house without assistance, and was at times confined to her bed for periods of days and was physically weaker than she had been before; her mental powers had grown weaker as a result of her loss of physical strength and health. She came of a family who lived to an extreme old age, but who in their later years suffered from mental breakdown and insanity. Some years before she made this will she showed that she was subject to illusions which manifested themselves in such ways as seeing decorations on a neighbor's house when there were none, hearing birds sing in winter when there were no birds about, and by steadily refusing to eat fruit given her by her brother because it might be poisonous. On some occasions she

manifested a suspicion concerning the honesty of her trusted female attendant. These acts and conduct did not persist for any length of time nor show a constant condition of mind, and when they passed her normal mental processes resumed control and enabled her to continue in control of her property up to the time of her death.

Mrs. Keenan made several wills before the one involved here. Some of them were executed prior to 1911; the contents of these is not known. In 1911 she executed one drawn by T. J. Pereles at her direction, in which she made similar bequests to relatives and to religious and charitable institutions as in this will, and gave the residue, which constituted the greater part of her estate, to the Wisconsin College of Physicians and Surgeons of Milwaukee, Wisconsin, to be used by it in carrying on the work of its free dispensaries in Milwaukee. It appears that Mrs. Keenan was informed by Miss Yorgey, who attended to her domestic and personal affairs under her direction, that this College of Physicians and Surgeons had gone out of existence and had transferred its property to Marquette University. At Miss Yorgey's earnest solicitation Mrs. Keenan requested an interview with *Nathan Pereles, Jr.*, who called at her home in the early part of 1913, bringing with him the will of 1911. This was his first business interview with the deceased. He had known her for many years when his father acted as her legal adviser. At this interview the will of 1911 was read to her in detail; she indicated what changes were to be made in some of the personal bequests, and directed that the residue be given as a fund for the care of the sick, and asked him to draw up a will embodying her suggestions. *Mr. Pereles* made a draft of the residuary clause, which gave the residue of her estate for the relief of persons afflicted with tuberculosis, and sent it to her house with a letter under date of February 13, 1913, addressed to her as follows:

"Dear Mrs. Keenan: Inclosed you will find draft of the

proposed clause in the will concerning the dispensary. As soon as you wish to see me about it, please telephone. I have left the name of the trustee blank, as I did not know whom you wished to name."

Within a few days *Mr. Pereles,* upon request of Mrs. Keenan, called on her at her home, and was told by Mrs. Keenan that the draft was not satisfactory because she wanted the fund to be used for the benefit of persons who were suffering from any illness and that she wanted *Mr. Dahlman, Mr. Nuzum,* and himself named as trustees. A copy of the draft of the residuary clause was then made by *Mr. 'Pereles,* submitted to her by him, and she approved it and directed him to prepare the will with these changes which she demanded to create the trust for the purposes of this charity. This he did, and on March 6, 1913, he went to her house, when the whole will was read to her paragraph by paragraph, except one, which she read. She approved the will and it was executed by her. She was then given a sealed copy and the original was taken by *Mr. Pereles* for safekeeping. The two codicils to the will were prepared at Mrs. Keenan's direction and embody the changes she wanted made in the provisions of the will. The circumstances that led her to make these changes in her will are fully detailed in the testimony and show satisfactorily that the codicils embody her own ideas and that they express her personal wishes of what she wanted done to modify the will. It is apparent that the last codicil includes the changes which were considered by her and Mr. McVety, with whom she was consulting in the month of May, 1915. About June 1, 1915, after she had had consultation with Mr. McVety concerning the steps that had been suggested to place her under guardianship and the provision contained in her will and codicil, she again summoned *Mr. Pereles* to her house by telephone and told him she desired some changes to be made in the will regarding the investments by the trustees, and that she contemplated providing

otherwise for Miss Yorgey and leaving out the bequest to her. *Mr. Pereles* suggested that she could provide that any person who attempted to contest her will to declare it void should forfeit any legacy given him in the will or codicils, which she approved and directed embodied with the changes she specified in a codicil. This was done by *Mr. Pereles* and presented to her June 7, 1915. The second codicil was then executed in his presence and that of Strous and Sullivan; the will and the codicil were attached and were taken by *Mr. Pereles.* Mrs. Keenan was given copies. At the interviews with Mr. McVety the will and first codicil were produced, talked about, and Mr. McVety told her she had given too much power to the trustees, and their power as to investments ought to be limited. This she did in the last codicil. Mr. McVety prepared a will after his interview with her which contained the provisions of the existing will, naming *Mr. Nuzum* executor and himself in the place of *Mr. Pereles,* and limiting the trustees' power of investment. This writing Mr. McVety brought to Mrs. Keenan's house on July 10th for the purpose of approval and execution. It was read by him to her, but before witnesses were procured she died.

In circuit court the case was tried to a jury and the court submitted to them three questions, namely: Was the deceased of sound and disposing mind and memory when she executed the will on March 6, 1913; when she executed the first codicil March 6, 1914; and when she executed the last codicil June 7, 1915? To each of these questions the jury answered "No." After hearing argument by counsel for the respective parties the trial judge changed these answers of the jury from "No" to "Yes," and on December 5, 1917, filed formal findings to the effect, as he had determined subsequent to the argument of changing the answers of the jury in the special verdict, that the proposed will and codicils were the last will and testament of Antoinette Keenan, deceased; that these instruments were properly executed; that

the same were not procured to be made by any undue influence, and that she was of sound mind and memory and had mental capacity to make them as her last will and testament. The trial court declined to pass on the question raised as to the invalidity of the trust created by paragraph 21 of the will.

The will and codicils as printed in the case cover fourteen pages and need not be reprinted here. After making a number of personal bequests and some gifts to charity, she gives the residue of her estate to trustees to hold in trust for the purposes: To convert the same into personal property, invest and reinvest it "only in first mortgages on improved real estate, municipal, county, or government bonds, or such other conservative investments as shall be permitted by law to trustees for investments, and such reinvestments of the securities coming to them shall be in conformity with the statutes and rules of court in such case made and provided." (Second codicil.)

The trust property is to be held by the trustees and be "known as the Mathew Keenan Endowment Fund," and is to establish and carry on one or more free medical dispensaries in the city of Milwaukee for the benefit of "such indigent sick persons residing in the city of Milwaukee as my said trustees in their wise discretion shall deem worthy of such aid and assistance," without regard to their race, color, or religion, and empowers them to exercise uncontrolled discretion to use the income of the trust fund for free medical dispensaries in Milwaukee or other agencies providing the same relief, upon condition that such extension of relief granted by the trustees shall not operate to create a right to the income of the trust except as the trustees determine. Other provisions of the trust prescribe various details concerning the execution and administration of the trust, not necessary to repeat here.

Judgment was awarded affirming the judgment of the county court admitting the will to probate and directing that

the cause be remanded to the county court for further pro-
ceedings according to law.

For the appellant there was a brief by *Paul D. Durant,*
attorney, and *Frank M. Hoyt,* of counsel, both of Milwau-
kee; a separate brief by *Mr. Durant;* and also briefs by
*O. T. Williams* of Milwaukee, of counsel; and the cause
was argued orally by *Mr. Hoyt.* and *Mr. Durant.*

For the respondents there was a brief by *Charles Weaver*
of Milwaukee, attorney for *R. Franklin Nuzum,* and by
*George Lines* and *Louis A. Dahlman,* both of Milwaukee,
attorneys for *Nathan Pereles, Jr.,* and *John F. Dahlman,*
trustees; and the cause was argued orally by *Mr. Lines* and
*Mr. Dahlman.*

SIEBECKER, J.   It is contended that the court erred in
finding that no undue influence was exercised upon the
testatrix to procure her to make and execute this will and
codicils.   The record fails to show that any improper at-
tempts were made to persuade or induce Mrs. Keenan to
make these testamentary dispositions of her estate or that
any undue influence was exercised that misled or improp-
erly influenced her to do so.   Upon this issue in the case
the trial court's conclusions are clearly right and cannot be
disturbed.

The important controversy of fact litigated in the case
is: Was Mrs. Keenan of sound and disposing mind when
she executed the instruments propounded as her last will
and the codicils attached thereto?   The foregoing statement
recites the leading incidents and facts of her life which bear
on this inquiry from the time of her husband's death in
1898 to the time of her death.   The evidence discloses that
she had characteristics that led her, without apparent justi-
fication, into unreasonable, arbitrary, and harsh conduct in
dealing with her relatives and those persons who served
her most faithfully in promoting her best interests and com-
forts in sickness and distress.   These attributes of her

nature seem to have sprung from her penuriousness, ava-
rice, perversity, and violence of temper. It is manifest
that these personal traits were intensified and less within
her control, by reason of impaired health and strength, from
and after 1907, and that her physical and mental feebleness
seriously affected her from this time to the time of her
death. The testimony also shows that she developed
vagaries and illusions, and that reason and expostulation
concerning them failed to impress her of their unreality or
that they were the birth of her imagination. Besides these
characteristics of temperament and abnormal mental mani-
festation, it is urged that her acts and conduct show that
physical and mental disease had so affected and impaired
her memory, will, and understanding as to render her in-
capable of comprehending and understanding her business
affairs or her relationship to those who were the natural
objects of her bounty. It is common knowledge that per-
sons may be so swayed by avarice, superstition, and per-
verse sentiments and feelings as to lead them into extreme
and unreasonable acts though they be of sound mind and
capable of fully understanding their affairs. Likewise,
individuals of sane and comprehending mind may persist
in notions and illusions, in spite of argument and explana-
tion which commonly appeal to and suffice to persuade the
generality of persons of their unreality. The evidence
shows that Mrs. Keenan at no time after her serious illness
in 1907 refrained from, nor was she prevented from, par-
ticipating in the management of her domestic or business
affairs. The evidence is clear that nothing was done with-
out her direction, nor were her personal and business trans-
actions finally consummated without her personal assent.
True, she conducted her affairs through agents and em-
ployees, but it is significant that none of them undertook to
do anything for her without submitting it to her for her
approval. It is urged that this was done to satisfy her no-
tions and childish disposition induced by her decrepitude,

but the fact appears to be that she comprehended the meaning and consequence of the transactions submitted to her. Her manner and method in participating in her affairs on these occasions show a persistent and constant determination to control whatever was before her, and her conclusions and directions were accepted and carried out. It also appears that she had such a grasp of these transactions that she intelligently and understandingly conferred with others respecting them, indicating that she had sufficient mental grasp to comprehend them and pass judgment on the subjects before her. Her physical frailty for many years seems to have rendered her unable to keep up a long or protracted interview about her business and to have prevented her from sustaining a mental strain for a long period at a time. It is shown, however, that whenever her physical strength enabled her to undertake to do business regarding her property, she displayed a mental condition which enabled her to comprehend and understand its bearing and relation and to determine what was to be done under the circumstances. It is also significant that she persistently adhered to the one plan of disposing of the bulk of her property in the form of a public charity and that she did not make many changes in the minor bequests on the several occasions when she had the testamentary disposition of her property under consideration. It is abundantly established that she acted providently in the management of her property and persistently insisted upon preserving it for a memorial for her deceased husband. Her acts and conduct and the manner of dealing with the persons whom she engaged to perform services for her in various capacities, from domestic service to professional employment, negative the claim that she was a mental incompetent and unable to manage her affairs. The reliance these persons placed on her capabilities to do what she did impairs the weight of their opinion that she was mentally incompetent to make the will and codicils in question.

Further specification of the details of the evidence bearing on Mrs. Keenan's mental soundness and capacity at the times she disposed of her property under this will would not be helpful. A study of the record has persuaded us that the findings of the trial court are abundantly supported by the testimony and that they cannot be disturbed. The verdict of the jury being advisory, the court was not bound by it and was at liberty to change the answers of the jury to special questions when it found they were not supported by the preponderance of the evidence.

The court properly made its findings of facts on the issue covered by the special verdict and was not required to submit the issues of fact to a second jury. The direction of another trial before a jury was a matter of discretion for the trial court. If the trial court was dissatisfied with the verdict as being against the weight of the evidence, it was incumbent on the court to make its findings on the issues tried in conformity with the preponderant weight of the evidence. This the court did, and we find the trial court is sustained by the record. *Will of Meurer,* 44 Wis. 392.

We find no basis for the contention upon the various questions presented by contestants that the court was clearly wrong in withdrawing from the jury the inquiry whether or not the will was the product of undue influence. The evidence fails to sustain this claim. As this court has declared:

"Undue influence is the very antithesis of right influence. It exists only where there is practical destruction of voluntary volition,—at least, is moral coercion for an ulterior purpose." *Ball v. Boston,* 153 Wis. 27, 141 N. W. 8; *Anderson v. Laugen,* 122 Wis. 57, 99 N. W. 437.

Since the questions litigated were ultimately decided by the court contrary to the verdict of the jury, the alleged errors of instruction to the jury cannot affect the judgment rendered and need not be considered.

The contestant offered *R. Franklin Nuzum* (the husband

of one of the legatees under the will) as a witness to testify to transactions and conversations by him with decedent and whether he observed that Mrs. Keenan, as he talked with her during her last few years, comprehended or had difficulty in comprehending what he said. All of the evidence was excluded upon the ground that the witness was incompetent. This evidence is also made a ground for contestant's motion for a new trial in connection with the ground of newly discovered evidence and the refusal of the court to grant a new trial, for the reason that ch. 433, Laws 1917, makes him a competent witness. This law became effective June 18, 1917, the day the jury's verdict in the case was rendered. We will consider this testimony in connection with these motions. The alleged newly discovered evidence of Miss Duell is to the effect that she had many personal transactions with Mrs. Keenan from the time of Mr. Keenan's death in 1898 to 1912; that she is a practical nurse and has at times lived with Mrs. Keenan; that she observed Mrs. Keenan manifesting lapses of memory, and that at times she refused to purchase provisions for herself and others at her house, except sauerkraut, on which she persisted in living; that she was unable to understand business affairs for days at a time, and that the witness knows of insanity of her sisters and brothers and facts in Mrs. Keenan's conduct indicating mental incompetency, and that in her opinion she was not mentally competent to comprehend and understand the provisions of the will nor her relations to persons who were the natural objects of her bounty. The transactions, conversations, and opinions sought to be elicited from *Mr. Nuzum* were in substance to the effect that she was not able to understand and comprehend matters and affairs he attempted to bring to her notice; that her memory wholly failed her in matters pertaining to her business, her relatives and who they were, and whether or not they were living, and what provisions she had made for them in the past or by her will,

and similar instances of loss of mind and inability to understand and comprehend ordinary details concerning business and property.    There is much testimony of this nature displayed in the record by persons having personal transactions and intercourse with Mrs. Keenan; yet in the opinion of the trial court, when considered in connection with the other testimony in the record, it was not sufficient to overcome the positive testimony showing that Mrs. Keenan had throughout her widowhood actively managed her property and affairs in such manner as to show that she comprehended and understood these affairs and that she had sufficient mental capacity to make the will in question.    It is also to be observed that the court was justified in holding that due diligence was not shown in securing the witness Duell.    Assuming that the witness *Nuzum* would be competent to testify on a retrial of the cause, we do not consider that his testimony and that of Miss Duell necessarily calls for a different finding by the trial court on the subject of decedent's mental soundness and capacity to make the will than the conclusion arrived at by the court in this trial.    Assuming that *Nuzum's* testimony would have been as appellant contends, its exclusion did not constitute prejudicial error in the light of its nature and probable probative value upon the issues litigated.

The argument that the provisions of the twenty-first article of the will indicate that the testatrix had no understanding or comprehension of their legal effect proceeds upon the assumption that they were unnatural, unreasonable, and confer such untrammeled powers on the trustees as no person of sound mind would embody in a will to create a charitable trust.    The force of this claim is refuted if the charitable bequest is valid in the law.    The contention is made that the trust provisions of the will are void because of their uncertainty, their inherent contradictions which make its execution impossible, and because it attempts to

withdraw the powers vested in courts in the administration of trusts and confer them on the trustees.

The trial court declined to determine the questions thus suggested, declaring they need not be determined in the probate proceeding and could more appropriately be considered thereafter. While this course of the trial may be justified in some cases, we think it appropriate to entertain the questions presented on this appeal in view of the fact that the questions are fully briefed and argued, and determination thereof will avoid further litigation and consequent expense. *Deller v. Deller,* 141 Wis. 255, 124 N. W. 278; *Estate of Judson,* 168 Wis. 361, 170 N. W. 254.

It is insisted that the residuary clause embraced in the twenty-first paragraph is void for uncertainty of devisee or beneficiaries. Discussion of this subject has been most searching and extensive in the cases in this court and anything repeated here would of necessity be in substance but a repetition of what has been stated in those adjudications. Among these cases are the following: *Ruth v. Oberbrunner,* 40 Wis. 238; *Heiss v. Murphey,* 40 Wis. 276; *Dodge v. Williams,* 46 Wis. 70, 100, 1 N. W. 92, 50 N. W. 1103; *Estate of Hoffen,* 70 Wis. 522, 36 N. W. 407; *Hood v. Dorer,* 107 Wis. 149, 82 N. W. 546; *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345.

In the *Hood Case* it was held that where by will property is directed and devised for a particular charitable purpose as distinguished from charity generally, with a class within which a trustee can select the beneficiaries and not so indefinite as to be unenforceable, it is a good charitable bequest.

"Given a trust, with or without a trustee, a particular purpose, as education or relief of the poor as distinguished from a bequest to charity generally, and a class, great or small, and without regard to location necessarily, as 'worthy indigent females,' or 'indigent young men studying for the

ministry,' or 'resident poor,' . . . and we have a good trust for charitable uses. The court, through its strictly judicial power, may fill the office of trustee, if necessary. The trustee can select the immediate beneficiaries or objects within the designated class and scheme. He can determine upon the details necessary to effect the intention of the donor within the general limits of his declared purpose, and execute the trust accordingly; and the proper public agencies, if necessary, can invoke judicial power to enforce such execution."

In *Dodge v. Williams* it was said:

"A charitable use is essentially shifting. When a trust defines the beneficiaries with certainty, it is rather private than public. . . . 'It is the number and indefiniteness of the objects, and not the mode of relieving them, which is the essential element of charity.'"

These observations apply and meet every objection urged by appellant against the invalidity of the trust in question. We cannot discover uncertainty or indefiniteness as to beneficiaries, we find no contradiction in the terms of the trust to prevent its enforcement, nor are the powers conferred on the trustees in conflict with the law so as to remove them from the supervision and control of the courts. The uncontrolled discretion conferred on them as to investments and reinvestments is so restricted in the second codicil as to clearly subject them to the control of the court and the statutes and laws governing trustees of charitable trusts. It is considered that the trust embodied in the will is a valid charitable trust and has no legal infirmities that prevent the courts from enforcing its provisions.

We find no reversible error in the record.

*By the Court.*—The judgment appealed from is affirmed.