ESTATE OF LAPER: LAPER, Appellant, vs. CHESEBRO, Respondent.

*September 19—October 16, 1923.*

*Wills: Testamentary capacity: Undue influence: Evidence: Sufficiency: Appeal.*

1. The evidence in proceedings to contest the probate of a will is *held* to sustain findings of the trial court that there was a lack of testamentary capacity on the part of the deceased and that there was efficient exercise of undue influence by his wife.
2. To avoid a will, the evidence as to undue influence and lack of testamentary capacity must be clear and satisfactory.
3. The supreme court does not try cases anew but passes upon the sufficiency of the evidence to sustain the findings. If there is sufficient evidence that a trial court can reasonably say is credible to sustain the findings, they will not be set aside although the record contains other conflicting testimony which, if believed, would be sufficient to sustain contrary findings.

ESCHWEILER, J., dissents.

APPEAL from a judgment of the county court of Fond du Lac county: A. E. RICHTER, Judge. *Affirmed.*

Proceedings for the probate of the will of John Laper, deceased. The county court denied probate of the will on the ground of lack of testamentary capacity, and inferentially, at least, on the ground of undue influence exercised by his wife and children by his second marriage. From a judgment denying the probate of the will the proponent appealed.

*H. E. Swett* and *L. E. Lurvey,* both of Fond du Lac, for the appellant.

For the respondent there was a brief by *Maurice McKenna* of Fond du Lac and *J. L. O'Connor* of Milwaukee, and oral argument by *Mr. O'Connor.*

VINJE, C. J.  The will presented for probate was executed September 20, 1919, and the testator died February 11, 1921, at the age of seventy-four years. His first wife died in 1882 leaving five children ranging in age from eleven to two years, and shortly thereafter at the age of about forty he married his second wife, who was then about seventeen years of age and who bore him four children, all of whom survive him. One child by the first marriage died without issue before his father's death and the whereabouts of one is unknown. The other three are contestants in this case.

The will bequeathed $500 each to one son and one daughter and $300 and $700 respectively to two other daughters of the first marriage. The balance of the estate, of a probable value of over $50,000, was left to his widow for life with remainder to his two daughters by his last marriage. A son and daughter by the last marriage are left out because he states they had already received their share.

The evidence shows quite clearly that the children by the first marriage were compelled by their stepmother to work very hard on the farm and that they received rather

harsh treatment from her, and all left home at an early age
and their subsequent relations with her were not cordial.
It is also established by the evidence that the children of
the second marriage and the surviving widow worked hard
while at home and helped accumulate the estate left by the
deceased.

The testator had been a hard-working man and up to the
last three or four years of his life had managed or at least
had a part in the management of his business affairs.   For
some years before he died he had suffered from senile
dementia and had twice been an inmate of a sanitarium in
Milwaukee.   The last time he was there he executed an
instrument revoking all former wills made by him.   This
revocation affected a will made in 1917 of the same con-
tent as the contested will except that $500 was left to two
daughters instead of $300 and $700 to each respectively.

The trial court found "that at the time of the signing and
the alleged execution of this will the testator did not have
sufficient mental capacity to understandingly execute his
will; that he had not then sufficient mental capacity to exer-
cise and use judgment of his own as to the disposition of his
property and was incapable of resisting the influence of
others and acting for himself in the disposition of his prop-
erty."

As reasons for holding the will invalid the trial court
stated:

"The testimony, I believe, shows that testator was a suc-
cessful business man, buying and selling farms and other
lands, etc., during a number of years before and after
he married his second wife, and that he accumulated a
considerable amount of property.   He transacted all his
business without consulting any one, so far as the testimony
shows, relying solely upon his own judgment in transacting
the business.   He was in good health for many years.   Later
on his health failed—he became weak mentally and physi-
cally.   He suffered a stroke.   He was subject to fits and at
times had attacks of insanity.   He charged his wife of being

intimate with other men, spoke about this to different persons, and had other delusions, as testified to by witnesses. One witness, Mr. Charles Kuehn, was able, without much effort, to convince him that such was not the case. He wanted to get a divorce from his wife so he could marry some other woman. He talked freely of such things and of his other troubles to others and sought their advice in matters that troubled him. He did not rely on his own judgment the same as he used to in former years. He allowed his wife and sons to draw funds out of the bank in such sums as they pleased without consulting him. He lost control of his business affairs, permitting his wife and son to manage them. On his return from Milwaukee the second time he spoke freely of the execution of the will he had made in that city to a number of the persons who testified at the hearing. He was anxious to communicate to everybody what his affairs and troubles were. He was a changed man—entirely different from what he had been previous to the year 1916. I believe that during the year 1918 and 1919 he had not sufficient testamentary capacity to make a will. He had not sufficient will power to withstand the influence of others. The strongest evidence of this fact is the making and executing of the will he made on September 3, 1919, at Milwaukee. I am satisfied that some of the children of his first wife, Mary and Julia, took him to Milwaukee for the express purpose of having that will made. They had the disposition and did exert undue influence on him, which resulted in the testator making that will. They had the opportunity to exert said influence, having taken the testator away from the influence of his wife, and the testator was easily influenced. That this will was procured by undue influence is sufficiently established by the statements and declarations of the testator to some of the witnesses, as well as by other facts and circumstances proven. The testator was in such weak mental condition that he was unable to resist the influence of others. He was incapable of making a valid will during that time. He had no will of his own. There is, of course, no direct evidence that his wife used undue influence at the time of the execution of the instrument presented for probate. That she did influence the testator in making this will there is no doubt in my mind. The only proof of an intention on her part to influence the deceased against his children by his

first wife is a threat she made as shown by the testimony of *Mrs. Werth* where she testified: 'I went and packed the suitcase, and while I was packing it she (*Mrs. Laper*) came in and she said, 'I always thought you girls would have some of his property, but now not a cent shall you have.' This statement was made in August, 1919, shortly before the testator was taken by *Mrs. Werth* to Milwaukee the second time. It is also a fact that *Mrs. Laper* never had any love for her stepchildren. She treated them very cruelly and drove them from their father's home. There was at that time and there is now a hostile feeling existing between her and some of the stepchildren. All this is clearly established by the testimony. I am satisfied that the testator did not, at the time of the execution of the will presented for probate, have sufficient testamentary capacity to make a will, and it is upon this fact that my decision is based and rendered. There is no doubt of the testator having been instructed and prepared beforehand at the time this will was executed. Neither the attesting witnesses to the will nor the doctors who testified at the hearing could, under such conditions and circumstances, have ascertained the true condition of the deceased's mind, to enable them to say whether or not he had testamentary capacity to make a will, by a casual or even a careful examination of his condition, and discover the influence exerted over him at that time."

It will be seen from this statement that the trial court found lack of testamentary capacity and the efficient exercise of undue influence by his wife. The evidence is voluminous and conflicting and would support a contrary finding. But the trial court had the advantage of seeing the witnesses and of judging of their credibility as well as of the likelihood of their effectively exerting undue influence. He could see from their manner, temper, and demeanor whether or not they were of a dominating nature and were ready to exert a dominating influence. The will referred to by the trial judge as having been made September 3, 1919, was the instrument revoking all former wills.

In coming to the conclusion that the judgment of the trial court should be affirmed, we are conscious of the rule that evidence to set aside a will must be clear and satisfactory.

*Lepley v. Andersen,* 142 Wis. 668, 125 N. W. 433; *Ball v. Boston,* 153 Wis. 27, 141 N. W. 8; *Will of Boardman,* 178 Wis. 517, 190 N. W. 355.

It was peculiarly the province of the trial court to pass upon the credibility of the witnesses, and if some evidence was properly discredited by him and other evidence properly believed there was left sufficient clear and satisfactory evidence to support the findings of fact. We feel that after making due allowance for the exercise of the judgment of the trial court as to the weight and credibility that should be given to the testimony of each witness we cannot say that he erred. Were the case tried before us *de novo* a different result might have been reached. But we do not try cases anew. We pass upon the sufficiency of the evidence to sustain the findings, and if there is sufficient evidence that a trial court can reasonably say is credible to sustain the findings they will not be set aside though the record contains other conflicting testimony which, if believed, would be sufficient to sustain contrary findings.

We purposely forbear to discuss the evidence in detail or to express any opinion as to the credibility of the different witnesses, because it is probable that, unless the parties are wise enough to settle their differences, there will be future litigation involving the same testimony.

*By the Court.*—Judgment affirmed.


ESCHWEILER, J. (*dissenting*). An examination of the evidence convinces me that the contestants have not shown sufficient evidence to warrant setting aside the will on the grounds either of incompetency or of undue influence, and I cannot, therefore, concur in the result.