ESTATE OF KITZ : DETTLAFF, Appellant, v. SIMON, Executor, Respondent.

*February 8—March 7, 1961.*

50

For the appellant there was a brief by *R. Curtis Laus* and *Andrew C. Thompson,* guardian *ad litem,* attorneys, and *Henry P. Hughes* of counsel, all of Oshkosh, and oral argument by *Mr. Hughes* and *Mr. Laus.*

For the respondent there was a brief by *Patri, Nolan, Crane & Engler* of Oshkosh, and oral argument by *Hibbard H. Engler.*

CURRIE, J. The issues raised on this appeal are as follows:

(1) Was the trial court's determination that testatrix possessed testamentary capacity against the great weight and clear preponderance of the evidence?

(2) Did the trial court commit prejudicial error which requires the granting of a new trial?

(3) Did the trial court err in concluding that there was no evidence presented on the issue of undue influence?

*Testamentary Capacity.*

At the time of the execution of the propounded instrument on June 2, 1958, testatrix was eighty-three years of age. Her estate consisted of approximately $40,000 of liquid assets.

The testatrix resided in the city of Oshkosh for many years prior to her death. At the approximate age of thirty-nine years she married Theodore Kitz in October, 1914. At the time he had two small daughters by his prior marriage, Ruth and Helen, aged approximately seven years, and one and one-half years. Helen, the younger child, resided in the home with her father and stepmother until she married at the age of twenty-one. The record is silent as to just what the age of Ruth, the older child, was when she left the parental home.

Theodore Kitz died on December 28, 1946, leaving a will by which he bequeathed his property in trust whereby the testatrix received a life estate therein and upon her death the remainder was to go to Ruth and Helen. The testatrix was named trustee of such trust. Included in such trust property were nine separate pieces of real estate. In the meantime, Ruth had married one Sosinski, and Helen had married one Schroeder. The Sosinskis and Schroeders were tenants in residence properties included in the trust. The testatrix was very displeased with her husband's testamentary disposition of his property, and because of this displeasure relations between her and her two stepdaughters became strained. On one occasion the testatrix expressed the hope that the stepdaughters would never live to enjoy their father's property.

She failed to keep the properties properly in repair and raised the Schroeder's rent 30 per cent.

On April 8, 1958, testatrix fell in her home and broke her hip. In spite of the strained relationship, she telephoned Ruth Sosinski, who lived close by, and Ruth came over and made arrangements for the calling in of a physician, Dr. Meilicke. The following day, April 9, 1958, Dr. Meilicke had testatrix 'removed to Mercy Hospital in Oshkosh. On May 12, 1958, the two stepdaughters signed a petition to the county court requesting the removal of testatrix as trustee of the Theodore Kitz testamentary trust because of "mental and physical disability." The court appointed Attorney Simon as guardian *ad litem* for the testatrix. Simon called upon her at the hospital several times and finally persuaded her on May 31, 1958, to sign an instrument by which she resigned as trustee and consented to the appointment of an Oshkosh bank as successor trustee.

On June 2, 1958, Simon received a call from someone not identified to come to the hospital for the purpose of drafting a will for testatrix. Simon went to the hospital shortly before noon and secured the necessary information for drafting such will. The will was typed in Simon's office that afternoon and about 4 o'clock Simon returned to the hospital accompanied by Mrs. Luker, his secretary. After arriving at the hospital a Mrs. Slife, who was employed in the hospital office and was a neighbor of Mrs. Luker, was asked to accompany them to the room of the testatrix. Mrs. Luker and Mrs. Slife stood in the room doorway while Simon read the will to the testatrix and asked her if that was the way she wanted her will, and she replied in the affirmative. She was then asked if she wished Mr. Simon, Mrs. Luker, and Mrs. Slife to act as witnesses to her will and she answered such question also in the affirmative. The testatrix then subscribed the will, and the other three sub-

scribed as witnesses. This is the instrument which has been propounded for probate. All three witnesses to the will testified that in their opinion the testatrix was then mentally competent.

Attorney Simon had known the testatrix since boyhood. In addition to his conversations with her on June·2, 1958, he had had prior conversations on several occasions the preceding month in his capacity as guardian *ad litem* in the testamentary-trust proceeding. Simon testified that on the morning of June 2, 1958, when he was obtaining information from her for drafting her will she told him that she wanted to leave everything to St. Mary's Church in Oshkosh for Masses for the repose of the souls of her father, mother, brothers, and herself. Simon stated that this rather startled him and he then asked her if she would not like to remember her stepdaughters and their children, and she replied, "No, I want to leave it all to my church." Simon did not know the names of her parents and brothers, and she supplied him with such names which appear in clause Second of the will.

The two stepdaughters on June 13, 1958, petitioned for the appointment of a general guardian for the·testatrix, and on June 24, 1958, the county court appointed Simon as such general guardian. On August 21, 1958, Simon and two hospital nurses signed a petition to the county court for judicial inquiry as to the mental condition of the testatrix. The county court under date of August 28, 1958, then committed her to Winnebago State Hospital where she remained until June 16, 1959, when she was transferred to the county asylum. She died an inmate of such county asylum on July 17, 1959. Her only surviving next of kin and heirs-at-law are thirteen cousins, one of whom is the objector, Rose Mary Dettlaff.

Dr. Meilicke, the original attending physician while testatrix was at Mercy Hospital, testified that in addition to her broken hip she had arthritis and a generalized arteriosclerosis

associated with some vertigo, and that she was senile as the result of such arteriosclerosis. He further testified that such arteriosclerosis and senility were an irreversible process and that her mental condition was becoming generally worse. He prescribed thorazine, a drug which had a quieting effect and which rendered her less agitated and more co-operative. Dr. Meilicke last saw her on May 29, 1958, four days prior to the making of the will. He expressed the opinion to a reasonable medical certainty that she did not have mental capacity to make a will on June 2, 1958. On cross-examination he admitted that she did have lucid intervals.

Detailed hospital records were maintained by Mercy Hospital stating the condition of the testatrix from day to day and the medical treatment that she received. There were frequent entries made as to her confused mental condition. The entry for June 2, 1958, stated that she was incoherent in speech much of the time and somewhat hostile.

Dr. Becker, an expert medical witness for the objector, examined the testatrix on June 12, 1958. His diagnosis entered on the hospital chart on June 12th was that she was a cantankerous, cerebral sclerotic with a healed, recent hip fracture. Such notation also stated:

"It is my opinion that she had generalized arteriosclerosis but that the process also involved the vessels of the brain and as such interfered with her mental processes."

Dr. Becker testified on the basis of the nurses' notes on the chart and his own observations from June 12 to June 20, 1958, that she was not competent to make a will early in June, 1958.

The two nurses, who attended testatrix and made the notations on the hospital chart records, were a Mrs. Kopitzke and a Mrs. Wingrove (formerly Miss Spreutels). They testified to the frequent, confused mental condition of the testatrix in May and June, 1958, while a patient at Mercy

Hospital. Mrs. Wingrove testified that testatrix had the hallucination that she was in prison and stated that she wanted to get out because she was innocent. On another occasion the testatrix stated to Mrs. Wingrove that she was God and would punish her. Mrs. Kopitzke testified that at no time after May 20, 1958, was the testatrix mentally competent. Mrs. Wingrove testified that she did not believe the testatrix at any time she observed her was mentally competent.

The objector also called as a witness Attorney James B. Sitter of the city of Oshkosh. Sometime after April 8, 1958, Ruth Sosinski, stepdaughter of testatrix, called Sitter to come to the hospital and draw a will for the testatrix. Sitter went to the hospital and interviewed her and found her suffering from hallucinations. One of these was that the nurses came through the transom of her room; another was that she could not understand why Father Ruehl had not come to visit her. Sitter then explained that Father Ruehl had been dead for many years, and she replied that that was no excuse for his failing to come to see her. Sitter refused to draft a will because of her mental condition. He testified that he did not believe the testatrix had sufficient mental capacity to draft a will.

The objector, Rose Mary Dettlaff, called twice in May and about four times in June to see the testatrix at Mercy Hospital. She testified that testatrix did not recognize her on any of these occasions and was irrational and made complaints about men being under her bed. It was her opinion that testatrix was not then mentally competent. Although Miss Dettlaff testified that the testatrix and she had been very close to each other, she admitted on cross-examination that she had never been in the home of testatrix.

Miss Angevine accompanied Miss Dettlaff to the hospital in May, 1958. She testified that the testatrix was terribly irrational, complained about men being under the

bed, and stated that a man had come and drunk out of her glass. Miss Angevine had known the testatrix ever since the former was fourteen years of age. She further testified she went to the hospital again in June and that one "just couldn't get any sense to what she was talking about."

The persons who testified in behalf of the proponent of the will, in addition to the three subscribing witnesses, were Helen Schroeder, Mrs. Schneider, Mrs. Miller, and a Dr. Petersik. In addition, Ruth Sosinski's deposition had been taken before trial.

The two stepdaughters, Mrs. Schroeder and Mrs. Sosinski, had nothing to gain either way in the outcome of the litigation. They were not named as legatees in the will, and, not being blood relatives, would not inherit any of the estate if it should be determined that the testatrix died intestate. Both testified that the testatrix over the years had expressed the intention to them of leaving all her property to the church. Both had called on her several times while she was confined to the hospital in May and June, 1958. They stated that on all occasions she knew them. It was the further testimony of each that the testatrix was mentally competent on June 2, 1958, to make a will. Mrs. Schroeder stated that about June 10, 1958, Mrs. Sosinski in the presence of a witness had asked testatrix if she had made a will and she replied, "Yes, I have everything taken care of." This testimony was substantially corroborated in the testimony of Mrs. Sosinski given at the taking of her deposition.

Dr. Petersik is a physician specializing in psychiatry. From 1947 to 1952 he was assistant superintendent of Winnebago State Hospital and from 1952 to 1959 he was superintendent of such institution. He did not examine or treat testatrix during the period she was confined to Mercy Hospital in 1958. However, in answer to a hypothetical question he expressed the opinion that testatrix was mentally

competent to make a will on June 2, 1958. His explanation for such opinion was the testimony given by the witnesses to the will which he stated was the only testimony bearing on her exact condition on that day. He further explained that patients such as the testatrix suffering from arteriosclerosis have very frequent unpredictable changes in the state of consciousness from hour to hour and day to day.

Mrs. Schneider had been a friend of testatrix for many years and they both had belonged to the same card club. She testified she visited testatrix in the hospital on several occasions and that testatrix always recognized her. In one of their conversations at the hospital the testatrix stated that she wanted to make a will, and Mrs. Schneider then suggested Attorney Simon. She testified that she thought that the testatrix understood the conversations that took place during these visits.

Mrs. Miller was a friend of the testatrix who had known her for the last three years preceding her hospitalization. She visited the testatrix five or six times at the hospital and on one of such visits the testatrix informed Mrs. Miller that she had made her will.

The parents and two brothers named in clause Second of the will for whose benefit the testatrix bequeathed her estate for Masses had all been dead for many years prior to June 2, 1958. The brother George had died twenty years prior thereto while the other brother, John, had died twenty-five or more years before.

Upon this review of the testimony and evidence presented we cannot hold that the findings of the trial court are against the great weight and clear preponderance of the evidence. In *Estate of Larsen* (1959), 7 Wis. (2d) 263, 273, 96 N. W. (2d) 489, this court stated:

"A finding of fact of a trial court made upon conflicting evidence should not be set aside on review if a judicial mind could, on due consideration of the evidence as a

whole, reasonably have reached the conclusion of the court below. 3 Am. Jur., Appeal and Error, p. 461, sec. 896; and *Estate of Llewellyn* (1929), 296 Pa. 74, 77, 145 Atl. 810, 66 A. L. R. 222, 225. We deem that this is but another way of phrasing the great-weight-and-clear-preponderance-of-the-evidence test long employed by this court in passing on findings of fact of a trial court."

We have no doubt that on many occasions during May and June, 1958, the deceased was mentally confused, irrational, and had hallucinations. On the other hand, there was ample evidence from which the trial court could conclude that she did have lucid intervals, and that such was the case when she was interviewed by Attorney Simon on the morning of June 2, 1958, and when she executed her will later that afternoon. While at first blush it seems unnatural that a person would leave a $40,000 estate for the saying of Masses for the souls of relatives who had been dead twenty years or more, the testimony of the two stepdaughters establishes that she had had such plan in mind for a long period of time. In fact, Mrs. Schroeder testified, "Her wish, which was told to me repeatedly before I was married and after I was married, that her money was not to go to anyone but for Masses for her father, her mother, her brother John and her brother George, and herself." It is our conclusion that a judicial mind could on due consideration of the evidence as a whole reasonably have reached the conclusion that testatrix was mentally competent to execute the will which she did on June 2, 1958.

Counsel for the objector contend that the trial court did not give sufficient weight to the testimony of Dr. Meilicke and Dr. Becker, the two attending physicians, both of whom expressed the opinion that she was not mentally competent to make a will on June 2, 1958. However, neither of these physicians saw her on that day, nor did either of them rule out the possibility that she may

have had lucid intervals on that day. As previously noted, Dr. Meilicke conceded that testatrix did have lucid intervals. There was ample credible evidence from which the trial court could conclude that she did have lucid intervals on June 2, 1958, when she gave the directions to Attorney Simon for drafting the will, and later when she executed it. We cannot hold as a matter of law that the trial court's determination was against the great weight and clear preponderance of the evidence merely because the same conflicts with the opinion evidence of such two physicians.

### Alleged Errors of the Trial Court.

When Dr. Petersik, called by the proponent, was on the stand he testified on direct examination that the confusion of the mind in a patient such as Mrs. Kitz is the result of the hardened arteries not supplying the brain with the proper amount of blood; that the cutting down of the blood supply causes the patient to have hallucinations such as imagining people would be in the room; and that when the blood supply is restored or increased that the same patient might be perfectly normal.

Then the following occurred:

"*Q*. And is this what you would call a lucid interval which we talked about here? *A*. Yes. Medically we would refer to it as a period of temporary remission, but it can be called a lucid interval.

"*Q*. During this period when the blood supply would be normal, would the patient have his normal recollection of who the members of his family were? *A*. It is entirely possible, yes."

Counsel for the objector objected to the answer because it expressed a possibility and not a probability. The trial court overruled the objection and permitted the answer to stand. Of course, an expert medical opinion expressed in terms of mere possibility is insufficient to sustain a finding.

*Powers v. Allstate Ins. Co.* (1960), 10 Wis. (2d) 78, 86, 102 N. W. (2d) 393; and *Michalski v. Wagner* (1960), 9 Wis. (2d) 22, 27, 100 N. W. (2d) 354. However, we can perceive no error in the instant ruling. It seems obvious to us, in reading the entire direct examination of Dr. Petersik by counsel for the proponent, that the answer in question was not elicited as proof of the mental condition of testatrix on the date of the signing of her will. Rather its purpose was preparatory to later further questioning of Dr. Petersik in which he was asked to express a medical opinion by having put to him a hypothetical question containing facts brought out in the testimony of prior witnesses. As a result of such further questions the witness did express the expert opinion that on the basis of such facts the testatrix was mentally competent to make a will on June 2, 1958.

It is, therefore, our conclusion that no error was committed in overruling the objection. Furthermore, the objection contained no motion to strike the answer objected to.

In the trial court's memorandum decision he mentioned his personal recollection of what had transpired in a conference in the judge's chambers with respect to the petition of May 12, 1958, of the two stepdaughters to have testatrix removed as trustee of the testamentary trust. Such petition had been drafted by Attorney Laus, now one of the counsel for the objector. Attorney Laus and Attorney Simon, as guardian *ad litem,* were present at such conference. After reciting these facts the memorandum opinion then stated: "The court recollects that the greatest stress placed upon the necessity for the removal of Mary M. Kitz as trustee was not so much her mental incapacity as her physical inability to perform the functions of trustee with reference to the proper supervision of the real estate in the trust." We agree with counsel for the objector that it was error for the trial court to interject into his memorandum decision this per-

sonal recollection of such conference, the facts of which were not made a part of the record in this case. However, we cannot bring ourselves to believe on the state of the record in this case that such error materially influenced the court's final determination, and, therefore, it was not prejudicial.

The apparent reason for counsel for the objector interjecting into the record the matter of such petition of May 12, 1958, of the stepdaughters, was in an attempt to impeach the testimony of the two stepdaughters, that testatrix was mentally competent on June 2, 1958, to make a will. Such petition asked for removal of the testatrix as trustee because of "mental and physical disability." Under the facts brought out by the testimony at the trial of this court, it seems rather clear that testatrix did, in May, 1958, suffer from mental disability that would have prevented her from continuing as trustee to manage the nine separate real-estate properties comprising the trust estate. This is because frequently there were times in her mental condition when she was confused and irrational. There is nothing necessarily inconsistent between such view and one that she had testamentary capacity to make a will on those occasions when she had lucid intervals. Therefore, we deem it entirely unlikely that any court would have given such weight to the allegations of such petition as to completely discredit the testimony of the two stepdaughters. We certainly would not.

### Undue Influence.

At the conclusion of the objector's case, the trial court inquired of Mr. Laus, counsel for the objector, as to whether he intended to put in any testimony that the instrument was procured by undue influence. Mr. Laus replied, "Not at the present time." Then this transpired:

"The Court: You have limited your testimony purely to the testamentary—lack of testamentary capacity.

"Mr. Laus: That is true, Your Honor."

However, on this appeal, counsel for the objector maintains it was error for the trial court to conclude in the memorandum decision that no evidence had been presented on the issue of undue influence. Such contention is grounded upon testimony given by Ruth Sosinski in her deposition which was introduced in evidence at the trial by the proponent.

In such deposition Mrs. Sosinski told about a particular conversation she had with the testatrix on visiting her at the hospital prior to June 2, 1958. We quote from the witness' testimony her recollection of such conversation:

"I said, 'You don't have a will? Do you realize where your money will go if you die?' Mary said, 'Sure, I'm going to give it to the church.' I then explained to her that Helen and I were not her next of kin but that the Dettlaffs were, and I said, 'If you die without a will they all get that money.' Mary says, 'Oh, no, they won't.' And I said, 'Well, they will if you die without a will.' And I got that over to her, and I said, 'So make one out. Do you want the Dettlaffs to have your money?' Mary said, 'No, they never did anything for me. They never even came to see me all while Dad's been dead. My money is going to the church.' I says, 'Well, then get a will; get a lawyer and get your will made out.' "

We fail to find anything in the statements made by Mrs. Sosinski to the testatrix which would support a finding that the former exercised undue influence which resulted in the making of the will of June 2, 1958. The statement that the Dettlaffs, who were the cousins of the testatrix, would receive her property if she died without making a will was a perfectly true statement. Mrs. Sosinski's statements to the

testatrix may have been the motivating force which caused her to draft a will. However, it is apparent from the quoted statements made by testatrix in such conversation that testatrix had no intention of leaving any property to the Dettlaffs. Therefore, the statements made by Mrs. Sosinski could not have had the effect of overpowering the mind and will of the testatrix in causing her to do something she did not wish to do. Without this factor of destruction of voluntary volition of the testatrix, Mrs. Sosinski's statements could not constitute undue influence. *Will of Ball* (1913), 153 Wis. 27, 38, 141 N. W. 8.

*By the Court.*—Judgment affirmed.